## REA *et al.* v. STEAMBOAT ECLIPSE.

1. ADMIRALTY—JURISDICTION—TRUST.

The jurisdiction of admiralty does not extend to the execution of a trust.  The title to a steamboat being in trustees, the beneficiaries may terminate the trust and obtain a decree of sale upon a proper proceeding in a court of equity.

2. PART OWNER—MASTER IN POSSESSION—CO-OWNERS CANNOT REMOVE.

When a part owner is master and in possession of a boat, under an agreement in writing, he is not subject to removal by his co-owners.

3. TITLE IN TRUST—TRUST TO TERMINATE ON PAYMENT, AND TITLE VEST ABSOLUTELY IN TRUSTEES—SUCH TRUST MERELY A LIEN.

Where the title to a boat is placed in two persons as trustees, to be held by them as part owners and for co-owners, until payment to the co-owners of certain sums representing the amount of their interests, and upon such payments the trust to terminate and title absolute vest in such trustees, the transaction is at most the creation of a lien in the nature of a mortgage, and the trustees are the legal owners of the boat.

4. IDEM.

Under such circumstances a bill of sale executed by the co-owners would pass to the purchaser no title beyond the equitable interests of such co-owners as beneficiaries of the trust.

5. PRACTICE—BILL OF EXCEPTIONS—EXTRANEOUS MATTER STRICKEN OUT.

Where the transcript of record contains evidence and extraneous matter not made a part of the bill of exceptions, such evidence and extraneous matter should on motion be stricken from the record.

6. PRACTICE—APPEALS IN ADMIRALTY CASES.  SAME AS OTHER CIVIL ACTIONS.

Appeals in admiralty cases from the district to the supreme court, are governed by the same statutes and rules that obtain in other civil actions tried to the court.

Filed October 4, 1886.

Appeal from the district court of the Third judicial district in admiralty.

*John E. Carland* and *Williams & Davidson*, for libelants and appellants.

*Flannery & Cook*, for respondents.

The facts are fully stated in the opinion of the court.

No briefs are on file.

W. E. CHURCH, J.    This was a proceeding in admiralty instituted by the libelants for the possession of the steamboat Eclipse. The libelants are Robinson, Rea & Co., Kay, McKnight & Co., A. W. Cadman & Co., and Joseph McC. Biggert, who in their libel, filed April 17, 1881, allege—*First*, that they are the majority of the owners of the boat, and, being such owners, on or about March 10, 1881, appointed one William Braithwaite master of said vessel to navigate and sail her for them at agreed wages, and said Braithwaite continued to be such master until April 4, 1881, when the libelants removed him as master, and appointed another in his place; *second*, that when the new master, so appointed by libelants, went on board said vessel, by their orders, to enter upon his duties, Braithwaite refused to give up the possion of the papers. Process was prayed against the vessel and Braithwaite, and was issued accordingly on the same day, returnable on the first Tuesday of June then next.

On June 4th the marshal returned that he had attached the boat under said process on the day it was issued, (April 7, 1881,) and that on the same day one Joseph Leighton put in a claim to the boat, and with the consent of libelants, and upon Leighton executing a stipulation for value in $12,000, that being the amount agreed upon between him and libelants, the marshal had delivered the boat to Leighton. On April 15, 1881, Braithwaite intervened as a claimant of the boat, as "trustee, one of the owners and master," averring that he was managing owner and master, and entitled to the possession and command. He also filed sundry exceptions to the libel, two of which were to the effect that the libel did not show to what extent or how the libelants were interested, nor who the other owners were, nor what their interests.

The libel was thereupon amended by adding, among other

things, the statement that Robinson, Rea & Co. own a $2,500 interest in said boat, Kay, McKnight & Co. a $450 interest therein, Joseph McC. Biggert a $2,500 interest therein, and A. W. Cadman & Co. a $100 interest therein; "and that the only other person having an interest in said steamboat is William Braithwaite, who owns a $2,500 interest in said steamboat." Possibly it was intended by this amendment to say that the interests of the respective parties were in the proportions indicated by the amounts stated; but, in any event, the statement was by no means an accurate one, as will appear further on. On May 7, 1881, Braithwaite filed further exceptions and answer, and on May 25, 1881, Leighton & Jordon filed their claim in intervention, claiming as purchasers under a bill of sale bearing date March 31, 1881.

Interrogatories were propounded and answered on both sides, and considerable evidence taken, and on September 4, 1884, the cause having been heard upon the pleadings and proofs, the district court made its findings, and entered a decree dismissing the libel, and also the intervention of Leighton & Jordon, and ordering the possession of the boat to be restored to Braithwaite. From that decree this appeal is taken.

The facts in the case seem to be as follows: On February 4, 1880, the steamboat Eclipse being hopelessly involved in debt, and about to be sold on executions against her, the libelants Robinson, Rea & Co., Kay, McKnight & Co., and A. W. Cadman & Co., being creditors of said boat, for the purpose of protecting themselves from loss, effected an arrangement with William Braithwaite, a steamboat Captain, and one John D. Biggert, neither of whom appears to have had any previous interest in the matter, to purchase the boat at the marshal's sale, put it in working order and run it. This agreement was reduced to writing, and was in substance as follows: Braithwaite and Biggert were described as parties of the first part, and the creditors named as parties of the second part. After reciting the financial condition of the boat, and the desire of the parties to prevent a sacrifice, it was agreed that the parties should contribute to a general fund the following amounts:

Braithwaite, Biggert, and Robinson, Rea & Co., $2,500 each; Kay, McKnight & Co., $450; and A. W. Cadman & Co., $100,— making $8,050 in all. Probably by some inadvertence the aggregate amount is thereafter twice referred to as $10,000. These several amounts were to be paid in cash to the parties of the first part in case the steamboat should be purchased by them as provided, or so much thereof as might be necessary to be used for that purpose was to be paid in cash, and the remainder to be used as working capital. The remainder of the agreement I give in its own language, viz.:

"*Second.* That, in addition to said cash fund, the several parties are to contribute, as capital, the amount of their respective claims against said steamboat, and, in case said steamboat is bought in by the parties hereto, their claims are not to be paid at once, but be receipted for by them, and afterwards paid as hereinafter provided for.

"*Third.* When the said steamboat is put up at marshal's sale, the same is to be bidden for by the parties of the first part to such an amount as a majority in interest in said amount of $10,000 may determine, and to be put in the name of W. Braithwaite and John D. Biggert as trustees, and to be held by them thereafter as such trustees, for the following uses and purposes: (1) That the same be managed and run in the interest of all the parties hereto, said W. Braithwaite to act as captain, and John D. Biggert as financial agent; the said Braithwaite to receive a salary of one hundred and fifty dollars per month, and said John D. Biggert to receive a salary of one hundred dollars per month, during the time she is run in the interest of the parties hereto.

"*Fourth.* Out of the earnings of said steamboat the respective claims of said parties of the second part are first to be paid; and (2) the full amount of their respective portions of said $10,-000 advancement is to be paid, and, when said parties of the second part are fully paid, then this trust shall cease and determine, and the said steamboat shall remain wholly to the use and benefit of the said W. Braithwaite and John D. Biggert, their executors, administrators, and assigns.

"Signed and sealed and delivered this fourth day of February, A. D. 1880, with our hands and seals."

The amounts due to the parties of the second part as creditors, respectively, is not stated in the contract, and nowhere appears in the record.

After the execution of this instrument, Joseph McC. Biggert was substituted for John D. as a party thereto, and, as Braithwaite insists, without his consent and against his protest.

In pursuance of this contract, Braithwaite came up from Pittsburg, Pennsylvania, to Bismarck, Dakota, to attend the sale, which took place about February 18, 1880, and then and there bid in the boat for $8,525, of which $8,050 was met by the payment by the parties to the contract of the amounts of their respective contributions above stated, and the balance was raised on the credit of the boat, and paid out of the subsequent earnings. Bill of sale was made by the marshal to Braithwaite and Joseph McC. Biggert, trustees. Braithwaite took possession as master, under the agreement and remained in possession until removed by the marshal, as before stated. And it may be here remarked that the removal of Braithwaite, and delivery of possession to the intervenors, Leighton & Jordon, was without any order of the court whatever.

Among other findings of the court is one, the tenth, "that said steamer was run by claimant during the navigation season of 1880 under said written agreement, and earned eight thousand dollars, which went into the hands of the financial agent under said agreement, and the same has not been apportioned or distributed." In the following winter the vessel was laid up in the ice in the Missouri river, a little below Fort Benton, Montana. The ice appears to have been quite heavy; and the parties in interest, fearing she might be injured or destroyed in the spring breakup, met February 2, 1881, and appointed a committee to effect a sale. This appointment was in writing, as follows:

PITTSBURGH, PENN., February 2, 1881.

"We, the undersigned, creditors and trustees of the steamer

Eclipse, hereby appoint William Rea, John D. Biggert, and J. C. Kay our committee to effect sale of said steamer, granting unto them, or a majority of them, power to accept any offer which they may receive for the purchase of the steamer; it being expressly understood that they shall not accept any offer of less than eleven thousand five hundred dollars cash, or equivalent in approved paper." (Signed by all the parties in interest, including both John D. and Joseph McC. Biggert.)

It would seem from the testimony that the minimum of $11,500 was fixed because that, with the undistributed earnings, would give each one of the parties in interest the amount of his investment,—"would let them all out."

Braithwaite testifies, and seems not to be contradicted therein, that, after this paper was signed, he remained in Pittsburgh until February 24, 1881, during which time, though they tried to sell, no sale was affected, and that "we had a meeting about February 23d. It was unanimously agreed by all parties interested that we could not sell the boat as she lay in the ice, and that I should proceed to the boat, and take a crew with me, and try and save the boat, and bring her to Bismarck." Braithwaite accordingly started on this mission, but was detained by various causes,—hunting up a crew, bad weather, etc.,—and did not get away from Bismarck until March 12th, reached the boat about March 20th, and found her all right. The river broke up March 28th, and on March 31st, between 6 and 8 P. M., Braithwaite arrived with the boat at Bismarck all safe and sound, and immediately telegraphed the fact to John D. Biggert at Pittsbugh. This telegram was received at Pittsburgh, April 1, at 3:07 A. M., and Biggert's reply, dated April 1st, was received at 10:30 A. M.: "Glad to hear it; I leave to-night for Bismarck." In the meantime,—that is, between February 24th, when Braithwaite left Pittsburgh to gather a crew, and make the necessary arrangements for bringing down the steamer, and March 12, when he started from Bismarck with the crew for the boat, considerable correspondence took place between him and John D. Biggert, who, notwithstanding the substitution of his brother Joseph's name in the original agree-

ment, seems to have been regarded as the active business manager, and was, as we have seen, one of the committee appointed February 2d.

In one of these letters, written by Braithwaite at St. Louis, March 5th, after requesting Biggert to get certain men ready to come on to Bismarck as soon as he should telegraph him of the safe arrival of the boat at that place, he says: "I am willing and anxious to sell the steamer Eclipse where she now lies, but not so anxious after the break-up, if she could be saved; and I don't think it would be hardly fair to you and I to sell her after we have stood the risk,—not unless we would make something more than we put in, for our trouble." This letter acknowledges receipt of one from Biggert of March 4th. Braithwaite also testifies that on March 2d he wrote Biggert a letter from St. Louis, saying that "if the boat was not sold before I left Bismarck on my way to the boat, and we had to take the chances of losing the boat in the break-up, my interest in the boat was not for sale." Another letter, dated March 3d, speaks of difficulty in getting engineer and pilot. The letter of March 2d Biggert does not produce, and says he did not receive it. He first testifies that he "received a letter from him some time in March, the 6th or 7th or 9th, or somewhere along there," and that he "received no other letter." Being then confronted with a letter from himself to Braithwaite dated March 5th, in which he acknowledges receipt of "your favor of the second inst., he says that was a mistake, and should have been March 3d. But we find another from him to Braithwaite, dated March 4th, which begins with the acknowledgment, "Your favors both received this morning." Apparently, therefore, Biggert's memory in reference to Braithwaite's letters is not very reliable.

This letter of March 4th speaks discouragingly of the prospects for the ensuing season on account of some pooling arrangements of other and stronger lines, and also speaks of some proposed freight contract, which he says he has talked over with Rea, and adds: "He is very positive, and will not agree, under any circumstances, to bind the boat until we get her back to Bis-

marck.   So please bear in mind they are determined to sell her; and, if you have any offers please telegraph me.   They are now satisfied there is no money for us there this season."   Another letter of March 8 speaks still more discouragingly of the prospects, and says;   "Our only salvation is to sell, and at the best possible price."

We have already stated that the boat reached Bismarck on the evening of March 31st.   By agreement in writing, bearing date on that day, Rea, Biggert and Kay, the committee appointed February 2nd, made a contract for the sale of the boat with one Batchelor, agent for Joseph Leighton.   That contract is as follows:

"This article of agreement, made at Pittsburg, Pa., this thirty-first day of March, 1881, between William Rea, John D. Biggert and J. C. Kay, committee appointed by creditors and trustees of steamer Eclipse, and authorized by them to effect sale of said steamer, of the first part, and Charles W. Batchelor, agent for Joseph Leighton, of St. Paul, Minn., of the second part, witnesseth, that, unless said steamer shall be destroyed; or injured, to an amount greater than five hundred dollars ($500) by the expected break-up in the Missouri river, said party of the first part agrees to sell and transfer said steamer, at the place where she has been wintered on the Missouri river, below Fort Buford, to said party of the second part for the sum of eleven thousand five hundred dollars, ($11,500,) and the said party of the second part agrees to pay the said sum of eleven thousand five hundred dollars ($11,500) in cash, or its equivalent, upon delivery of proper bill of sale; the party of the first part agreeing to deliver said steamer free of debt. Said party of the second part agrees to all the terms and conditions above stated.

In testimony whereof, we, the undersigned, affix our hands and seals on this date above mentioned.

WM. REA,
JOHN D. BIGGERT,
J. C. KAY,
CHAS. W. BATCHELOR,
    Agent for Joseph Leighton.

Witness:

> W. DWIGHT BELL, as to John D. Biggert and C. W. Batchelor, Agent.
>
> GEO. W. GOODWIN, as to Wm. Rea and J. C. Kay."

The first information Braithwaite received of this transaction was contained in a telegram from Leighton, dated at Valley City, D. T., April 1st, and received at 10:44 A. M., as follows:

"*To Capt. Braithwaite:* If anything wanted to make boat ready for Buford trip, telegraph St. Paul for it in my name. Express it. Have bought her.                    ` J. LEIGHTON.

To which Braithwaite promptly replied, on same date, from Bismarck:

"*To Joseph Leighton:* My boat not for sale. She leaves for Benton on the 8th. Will take sixty tons of way freight.

                         W. BRAITHWAITE."

Evidently Leighton knew where the boat was. Biggert says that at the time the contract was made with Batchelor he did not know of the safe arival of the boat. His telegram to Braithwaite on the morning of April 1st has been given above. It will be observed that it contains no illusion to the contract. Upon that same evening. however, at 6:48, the committee united in the following telegram:

"*To W. Braithwaite:* Boat sold to Leighton yesterday. Bill of sale made. Do nothing about trip until Biggert gets there. Leaves tonight.                    WM. REA,

                         JOHN D. BIGGERT,

                         J. C. KAY,

                              Committee."

A bill of sale was drawn up for the conveyance of the vessel to Leighton, and his partner, Jordan, for the sum of $11,500. It bears date March 31, 1881, and describes the grantors as "William Braithwaite and John D. Biggert, in our own right, and William Braithwaite and Joseph McC. Biggert, trustees of Robinson, Rea & Co., Kay, McKnight & Co., and Cadman & Co., together with the said Robinson, Rea & Co., *cestui qu. trust,* owners of the steamer or vessel called Eclipse." It was

signed by, or on behalf of, John D. Biggert, A. W. Cadman & Co.. Robinson, Rea & Co., and Kay, McKnight & Co., and acknowledged by or on behalf of these parties April 1st, before a notary public, who also certifies that John McC. Biggert acknowledged it, which was probably an inadvertance, as he does not appear to have signed. This bill of sale was not delivered at once, but John D. Biggert took it, with the contract and the appointment of the committee, and went to St. Paul to meet Leighton, with whom he proceeded to Bismarck, arriving there on the evening of April 4th. The contract and bill of sale were delivered to Leighton so he testifies, in St. Paul, Sunday morning, April 3d. On the arrival at Bismarck, Braithwaite was applied to sign the bill of sale, but refused, assigning as a reason therefor, according to Leighton's testimony, that the old owners had not settled with him. At Bismarck, and as Leighton says, before the conversation with Braithwaite, Leighton gave John D. Biggert his check for $2,500 on account of the purchase money, and a week later, at Buford, the balance was settled by the delivery to Joseph McC. Biggert of a draft on P. H. Kelly & Co., bankers, for $9,000, which has never been paid, but appears to have been deposited with Batchelor, Leighton's agent, to hold until the title to the steamer is freed from litigation. Leighton had ascertained from John D. Biggert, on their meeting in St. Paul, that the record title was in Braithwaite and McC. Biggert.

By the breaking up of the ice that year very great damage was done to the tonnage of the river, and this, of course, enhanced the value of such as escaped injury. The evidence tends to show that the Eclipse, safe at Bismarck, March 31st, was worth $20,000. There was due Braithwaite $800 for wages No tender of this, or any other amount, was made to him. None is made in this proceeding. Braithwaite having refused to surrender possession, and having been notified, on April 6th, by John D. Biggert, assuming to be attorney in fact for the other parties in interest, that he was instructed to relieve him as captain of the steamer, and appoint Capt. Mariner in his stead, these proceedings were begun. Other facts appearing in the

record color the transaction, but enough has been stated for the determination of the case in the view which we take of it.

It will be profitable first to examine and determine the effect of the purchase made at marshal's sale under the contract of February 4, 1880. Into that contract it is obvious that Braithwaite and Biggert, or the Biggerts, entered as new parties, with the purpose of eventually becoming the owners of the boat, while the other parties entered into it for the protection of their existing interest as creditors of the boat. The legal title was vested in Braithwaite and Biggert, who were to hold as trustees until there should be paid—first, the respective claims of the creditors, parties of the second part; and, second, the full amount of the respective portions of the money advanced for the purchase, which, being accomplished, the trust was to cease, and the boat be the property of the parties of the first part free from any claim or interest of the other parties. No provision is made for repaying to Braithwaite and Biggert the amount of their advances, for the very obvious reason that they were regarded as the owners of the boat.

It is quite clear that this trust might at any time have been terminated by the payment to the parties of the second part of the amounts due them, respectively; and it seems equally clear that, to the extent to which earnings of the boat were actually received by Biggert the chosen financial agent, the title to the boat, at least so far as Braithwaite's interest in her was concerned, was discharge of the trust. And if, at any time, the creditors should have become dissatisfied with the execution of the trust in respect of the production of the fund for the payment of their claims, it seems evident that they could only have wound it up, and compelled a sale of the boat by resorting to a court of equity. The jurisdiction of admiralty would not extend to such a case. Nor do we think that, under that contract, the parties of the second part could be regarded, in any legal sense, as owners of the boat. The owners were Braithwaite and Biggert, each of whom owned one-half, subject to the trust, which was at most a lien in the nature of a mortgage,

and Braithwaite was also the master, in possession, with all the rights incident to his position as such.

This was the state of affairs at the close of the season of 1880, at which time, however, the boat had earned some $8,000 which had passed into the hands of the financial agent, relieving the trust, at least as to Braithwaite, *pro tanto*. The boat being now locked up in the ice, it seems to have been concluded desirable by all concerned to sell her as she lay, rather than take the chances of the break-up, and the committee was accordingly appointed. Whether the appointment vested in the committee an absolute power to sell and convey, or only a power to negotiate a sale, and make a contract for the sale of the boat which should bind the legal owners to execute and deliver the written transfer required by the statute, (Civil Code, § 634) it is not necessary to inquire very closely. Two things are clear: First, that their powers were strictly limited by the terms of their appointment, which were fully known by both Batchelor and Leighton; second, that the only instrument ever executed by this committee, as such, was a contract of sale, by which it was evidently not intended to transfer title, the terms of which were conditional, and which, therefore, would not, in any view, operate as a transfer. And this is made more obvious from the fact that no money whatever was paid at the time the contract was executed, nor until the fifth day thereafter, when a small portion of the purchase price ($2,500) was paid.

Benjamin, in his treatise on sales, speaking of the rule invoked by counsel for appellants, that a contract of sale passes the property immediately, before payment or possession, remarks that this rule is adopted in favor of the seller, and not in favor of the buyer, and is hence likely to mislead; also that it involves three conclusions, of which two are: First, that the goods are at buyer's risk; second, that the seller is entitled to payment. Benj. Sales, § 318. Neither of these conditions existed in the case before us. This question, however, like many others which have been subjects of judicial contention, would seem to have been settled by the provisions of our Civil Code, §§ 634,

637.   The intervenors evidently gave their interpretation to this instrument; for, in Article 2 of their petition, they speak of it as a contract, whereby Leighton contracted and agreed to buy, and the committee contracted and agreed to sell; and in the third article set out the bill of sale as made in pursuance of this contract, which, indeed, by its very terms, makes the delivery of a proper bill of sale a condition precedent to the payment of the price.

It is, perhaps, unnecessary to determine whether this contract, regarding it as executory only, was within the scope of the powers conferred upon the committee by the written appointment, though it would seem, at least, doubtful whether they might thus, without any present or certain considerations, tie their own hands by a bargain, the risk of whose conditions lay almost wholly with the boat.   Biggert attempted to pass the title in St. Paul, before a dollar of the purchase money had been paid, and, according to Leighton's own testimony, the $9,000 balance was not paid until some days after these proceedings were commenced, and then only by an apparently *pro forma* delivery of Leighton's personal draft, which was certainly not cash, and which was immediately redeposited with Leighton's own agent, to remain until the title could be perfected.

The alleged bill of sale was, we think, entirely ineffective so far as Braithwaite is concerned.   It was not signed either by Braithwaite or Joseph McC. Biggert, the legal owners, nor by the committee as such, and could not operate to pass anything more than the equitable interest of those by whom it was executed.   So far as the parties interested were concerned, we think the appointment of the committee, February 2, 1881, was a merely temporary arrangement, which was not intended to and could not in any just view of it, operate to divest the legal title, or in anywise change the rights of Braithwaite, at least until a sale made under it; and, assuming the truth of Braithwaite's uncontradicted testimony, it is, at best, extremely doubtful whether, after the meeting of February 23d, or rather, perhaps, after his departure from Bismarck, March 12th, the committee

could, in good faith towards him, have made a sale of the boat under that appointment.

At the time these proceedings were begun, therefore, the matter stood thus: Braithwaite and Joseph McC. Biggert were the legal and equal owners of the boat, subject to the trust created by the original agreement, the extent of whose burden could only be ascertained upon an accounting. Braithwaite was not only half owner, but master, in possession under a written agreement, and therefore not subject to removal by his co-owners. Rev. St. U. S. § 4250. Moreover, the boat was indebted to him for wages in the sum of $800. Of the libelants Joseph McC. Biggert was a one-half owner. The others were not legal owners at all; and, if the bill of sale was effective for any purpose, had parted with their equitable interests to Leighton & Jordan.

Assuming that the amended libel states a sufficient cause of action for the relief demanded, we think that its material allegations are not only not supported, but clearly negatived, by the proofs. The only interest which Leighton had in the boat was such as he derived under the executory contract of March 31st, supplemented by whatever he may have acquired by the bill of sale; but these could, at most, as against Braithwaite, be made the basis for a bill in equity to compel specific performance, and such matters are not within the cognizance of a court of admiralty. We are therefore of the opinion that both the libel and the intervention of Leighton & Jordan were properly dismissed.

While we have thus expressed our opinion upon the merits of the case, we are of the opinion that the motion to strike out and eliminate from the transcript all the evidence and extraneous matter not made a part of the record by a bill of exceptions should prevail; that this appeal, and all appeals in admiralty cases from the district courts to the supreme court of the territory, should be governed by the laws, statutes and rules that obtain in other civil actions tried to the court; and that, this court having obtained jurisdiction of the cause by service of the usual notice of appeal and undertaking, no error appearing from an inspection of the judgment roll proper, the judgment of the lower court must be affirmed.

All the justices concurring, except FRANCIS, J., not voting.