1   455
1   475
48*  354
48*  362

WILLIAM BRAITHWAITE, Plaintiff and Respondent, *v.* HENRY C. AIKIN and HARVEY HARRIS as Administrator, etc., Defendants. THOMAS C. POWER and JOHN W. POWER, Defendants and Appellants, and WILLIAM REA and GEORGE F. ROBINSON, copartners, etc., J. C. KAY and WOODRUFF MCKNIGHT, copartners, etc., A. W. CADMAN and JOSEPH McC. BIGGERT, Intervenors and Respondents.

**1.  Contract of Affreightment.**

The master of a vessel agreed for a stipulated price to transport goods from Bismarck, Dak., to Ft. Buford, Mont. The closing of navigation interrupted his voyage. A few days afterwards consignee forcibly took the goods from him. *Held*, that the master, being able and willing to complete the transportation to earn his freight, could recover full freight.

**2.  Same; Time of Delivery.**

No time of delivery being specified in the contract of affreightment, *held, further*, that the master could rightfully have held the goods until the opening of navigation, that he might earn his freight by completing the transportation.

**3.  Same; Suit by Trustee of Express Trust.**

*Held*, that plaintiff might sue upon the contract of affreightment set forth in the opinion as the trustee of an express trust, under § 4872, Compiled Laws.

**4.  Partnership; Partners as to Third Parties.**

The owners of three steamers operated them jointly for their own benefit, under the name "Benton Line." *Held*, that they were all liable as partners or joint traders on a contract of affreightment made by

their authorized agent in such name of "Benton Line" to carry goods in place of one of such boats. It seems that by operating such boats jointly in such a manner for two seasons the owners would have rend. ered themselves liable as partners or joint traders even though they had not been such in fact.

5. **Same; Death of Partner; Substitution of Administrator.**

One of three defendants having died *pendente lite*, and his administrator having been substituted, and having voluntarily appeared and defended the action, and no objection having been raised by any of the defendants to such a course until after trial and verdict, *held*, this court would not on appeal of surviving defendants reverse judgment against all the defendants when the portion thereof relating to the administrator provides that the judgment against him shall be paid only in due course of administration.

6. **Courts of State Successors of Territorial Courts.**

The district court of the state of North Dakota is the successor of the territorial district court, and has jurisdiction to render judgment in actions pending in such territorial court at the time of the admission of the state into the federal Union, although the verdict was rendered before such admission.

7. **Appeal—Appellant Cannot Question Ruling Not Affecting His Rights.**

Defendants cannot raise the point that a judgment against them should have been in favor of the plaintiff alone, and not in favor of the plaintiff and intervenors. This is a matter exclusively between the plaintiff and the intervenors.

(Opinion Filed January 15, 1891.)

*A*PPEAL from district court, Burleigh county; Hon. W. H. WINCHESTER, Judge.

This action was tried in the territorial district court before Hon. Roderick Rose and a jury. After verdict, but before judgment, North Dakota was admited into the Union.

Francis & Barnes for appellants: The steamer Eclipse having been lost before the beginning of this action plaintiff's agency for her owners had terminated, and he could not maintain this action. Ins. Co. v. Ruggles, 12 Wheaton, 498. The Eclipse was a general ship—carried other goods than those here involved. In an action for freight of goods carried in a general ship all the owners must join. Abbott on Shipping, 7th Am. Ed., p. 115; Abbott's Law of Merchant Ships,

12th Ed., p. 69; Parsons on Maritime Law, vol. 2, pp. 671–2; Parsons on Shipping, vol. 1, pp. 116–17. The verdict is void because it is a joint verdict against surviving defendants and the administrator of a deceased defendant. Wait's Practice, vol. 1, pp. 153–4; Estee's Pleadings, vol. 1, p. 85; Pomeroy's Remedies, 2d Ed., pp. 357–60 and pp. 454–5.

Geo. W. Newton for plaintiff and Louis Hanitch for intervenors: Defendants by not raising point of non-joinder by demurrer or answer have waived it. Coulson v. Wing, 22 Pac. 570; Samainego v. Stiles, 20 id. 607; 1 Wait's Pr. 119–20; Dunnell v. Walsh, 33 N. Y. 43. Master of boat may sue in his own name. Lewis v. Hancock, 11 Mass. 72; Bliss Code Pl. § 59. The administrator of the deceased defendant was properly substituted as a party defendant. Pomeroy's Remedies, § 407; Lecher v. Trilling, 24 Wis. 610; Bank v. Howland, 42 Cal. 129; Gardner v. Walker, 22 How. P. 405.

CORLISS, C. J. In November, 1880, the steamer Eclipse sailed from Bismarck, in the territory of Dakota, on an eventful voyage up the Missouri river, bound for Ft. Buford, Mont., laden with army supplies consigned to the quarter-master at that point. She never reached her destination, but was frozen in about 60 miles from the fort by water and 35 miles from it by land. There has been much litigation connected with this vessel. Some of it has been finally disposed of, (Rea v. Eclipse, 30 N. W. Rep. 159; on appeal, 135 U. S, 599, 10 Sup. Ct. Rep. 873;) and some of it awaits final settlement by this court on this appeal. The purpose of this action was to recover full freight for transporting these military stores under an agreement to carry them from Bismarck to Ft. Buford. Deferring for the present the consideration of the question whether the defendants against whom the judgment appealed from was rendered are liable, and whether the plaintiff has shown a right to maintain this action for such freight in his own name, we will first determine whether any freight can be recovered at all, and, if so, whether full freight, or only a portion thereof, was earned. The judgment was for the full amount agreed to be paid. The goods were not delivered at the point to which they were con-

signed. Were there no other facts in the history of this case, the judgment of this court must condemn the recovery of any amount. A contract of affreightment is subject to the general rule of law that the person who claims compensation must perform every condition precedent of an entire contract before his claim for any amount will be heeded. Part performance will not entitle him to *pro rata* pay, unless such incomplete performance is voluntarily accepted by the one entitled to insist on perfect compliance with all the terms of the contract, under such circumstances that the law will imply a promise to pay for that which has been done. It is upon this principle that the adjudications stand allowing freight *pro rata itineris*. Pars. Merc. Law, 350; Transportation Co. v. Hoyt, 69 N. Y. 230; McGaw v. Insurance Co., 23 Pick. 405-411; Coffin v. Storer, 5 Mass. 252; The Nathaniel Hooper, 3 Sum. 542. This doctrine, with its limitation, is embodied in our Code. §. 3868, Comp. Laws. But it is here insisted that full freight was properly allowed, and the statement of additional facts is necessary that we may weigh the full force and merit of this contention. When the master of the steamer discovered that to proceed further on the voyage was impossible, he immediately began to prepare a safe place for the cargo on the shore, with the intention of afterwards taking steps to complete the transportation, and make delivery at Ft. Buford, as required by his contract. Two days were occupied in unloading, and on the following day the consignee appeared in the person of the officer of the day of the fort, and demanded the carog. It is evident that in so short a time the master of the steamer had had no opportunity to make arrangements for completing the transportation. He was not then in default, unless he had refused to proceed further with the goods, which is not pretended, or perhaps unless the voyage had been interrupted because of his own careless act. We are not apprised that any negligence of his in this respect is claimed, nor do we find in the record anything to warrant such a contention. The voyage was suspended ' .r a time by an act beyond the power of man to control. But the ability to complete the transportation was not necessarily gone; nor does the disposition to perform his contract seem to have

been wanting on the part of the master. It is true that, had the delivery been thus prevented not merely temporarily, but for all time, the fact that this result had been brought about by the operation of the elements beyond man's control would have furnished no excuse for a failure to comply with an unconditional engagement to make delivery at the place specified; and, had there been an absolute promise to lay down these stores at Ft. Buford by a certain date, the carrier must have been without redress, though the unexpected freezing of the river had rendered delivery by that date impossible without the slightest fault on his part. But no time of delivery was prescribed by the contract of the parties. The law allows a reasonable time under all the circumstances. Comp. Laws, § 3572. The freezing of the river did not exonerate the master from the contract duty of making delivery at Ft. Buford, but, being without fault, it did release him from the obligation to deliver the goods by the same time which would have witnessed their unlading at Ft. Buford had the navigation of the river remained unobstructed. See Parsons v. Hardy, 14 Wend, 216. It cannot be possible that a consignor who places no restrictions as to time upon the transportation of his property has the right under the law to insist that a voyage commenced on the verge of winter shall be completed before navigation closes when this is impossible, no negligence of the carrier concurring to cause delay. The reasonable time in which the delivery may be made must be gauged by the exigencies of the case. To lie for months by a wharf, with clear channel from vessel's prow to point of unlading, would be indefensible. But, when caught in the ice without fault, to lie for as many months in the inexorable embrace of nature, brings no blame to man, for human laws recognize man's impotence before the might of natural laws and forces. It is true that the master was at liberty to forward the freight by other means. 1 Pars. Shipp. & Adm. 233, and cases cited. This he was given no opportunity to do. It is also true that he might without legal fault have waited until the opening of navigation in the spring to resume his voyage and transport the freight to its destination in the bottom in which it was originally shipped. It was, of course, his duty in the meantime to protect the prop-

erty, and this it is undisputed he was doing when it was taken from him by force by a squad of men from the fort, acting under the instructions of the consignee. He protested against this, insisting upon his right to earn his freight by completing the transportation; but all his protests were unavailing, and he finally yielded only to superior force, without resistence, it is true, but this was commendable, as bloodshed would have probably resulted had forcible opposition been interposed.

The master has a lien on the property to enable him to earn his freight. The moment the transportation begins the lien attaches, and is not divested so long as the master is proceeding not in default. The consignor is not bound to pay until the transportation is completed in accordance with the contract, but he may not prevent the master's earning his freight. If he takes possession of the goods short of their destination, when the master, not in default, is willing and able to complete the transportation, he must pay full freight. He has prevented or waived the performance of the condition precedent. The law therefore regards it as performed. It is true that in this case the performance was prevented by the consignee, and not by the shipper; but in this respect the consignor is represented by the consignee, and the former is responsible for the acts of the latter. The consignor has done his full duty to the consignee when he has paid or agreed to pay freight to a certain point. If the consignee sees fit to take the goods at some other place when the transportation is only partially completed, and when the master is able and willing to perform his contract, he, the consignee, can make no claim against the consignor, and the latter should therefore pay the freight which the master was able, willing, and had a legal right to earn. "There can be no action unless delivery is either made or prevented from being made by the act or fault of the shipper or consignee." 1 Pars. Shipp. & Adm. 220. The consignee, under our statute, controls the delivery of the freight, even in cases where there is a conflict between him and the consignor. § 3846, Comp. Laws. He certainly has no greater right to prevent the carrier's earning freight than has the shipper. The shipper cannot, although he owns the property, stop the trans-

portation at any point without paying full freight. 1 Pars. Shipp. & Adm. 231. The carrier, as before stated, has a lien for his freight and to earn his freight, so long as he is not in default; and neither the consignor nor the consignee can take from him the power, under such circumstances, to earn his freight, without being held to have waived the performance of the condition precedent to make delivery at the place specified. The authorities are very satisfactory on this point. Moreover, the doctrine stands on principle, and our Code has embodied this rule in statutory form. § 3868, Comp. Laws; Pars. Merc. Law, 349; The Nathaniel Hooper, 3 Sum. 542–555. Bradstreet v. Baldwin, 11 Mass. 229; Luke v. Lyde, 2 Burrows, 882–887; Palmer v. Lorillard, 16 Johns. 348; Clarke v. Insurance Co., 2 Pick. 104; McGaw v. Insurance Co., 23 Pick. 405–410; Hunter v. Prinsep, 10 East, 394; and cases hereafter cited. We are clear that at the time the master was prevented from completing his transportation of the property he was able, willing, and had the legal right to go on with his contract, and make delivery at Fort Buford. The voyage was merely interrupted. The delay occasioned by this unavoidable accident had not been, nor was it likely to be, so great as to justify the consignee in assuming that the delivery would not be made at Fort Buford within a reasonable time, under all the circumstances. Even though the master had distinctly informed the consignee that he would not proceed with his contract until he could continue the transportation by river, in the spring, we believe that under the authorities the consignee could not have demanded the goods without entitling the plaintiff to full freight.

In this we are sustained by eminent authority; and on principle the consignor, who had failed to provide against such a contingency in his contract of affreightment, should not be allowed to insist under such circumstances that the carrier, at perhaps an expense so great as more than to destroy the profit of the voyage, should forward the goods by another route, and by other means. A shipment by water on the verge of winter must be understood by both parties to be subject to the risks of delay from the closing of navigation, nothing to the contrary appearing in their contract. The agreement was to transport

all the way by water. A reasonable time to carry by water is a reasonable time during the period that navigation is possible. In Luke v. Lyde, *supra*, Lord Mansfield says, (page 887): "If a freighted ship becomes accidentally disabled on its voyage (without the fault of the master) the master has his option of two things—either to refit (if it can be done within convenient time,) or to hire another ship to carry the goods to the port of delivery. If the merchant disagrees to this, and will not let him do so, the master will be entitled to the whole freight of the full voyage. And so it was determined in the house of lords in that case of Lutwidge v. Grey, [H. L. 1773.]" In Clark v. Insurance Co., 2 Pick. 104, the question for decision was whether the ship-owner could recover insurance on freight, or freightage, as our statute terms it, he having delivered the cargo to the shipper, who demanded that it be immediately sent forward or delivered to him. At this time the vessel was in the port of Kennebunk, Me., into which she had put on her voyage to make repairs in consequence of damages suffered during a severe gale. It was found that it would take two months to put the vessel in proper trim to continue her voyage. The ship-owner could not recover insurance if it was still in his power to earn his freight at the time he delivered the cargo to the shipper notwithstanding the demand; and the court ruled that the underwriters were not liable, because the ship-owner, to earn his freight, might have resumed and continued the voyage after the repairs had been made; that he was not bound to deliver at the intermediate port in spite of the delay except on receiving full freight. The court said: "One test of this reasoning would be to consider whether the merchant had a right to his goods at Kennebunk, against the will of the shipper, without paying freight. It has been already said that the contract of affreightment is not to be terminated at the will of one of the parties only. Delays not occasioned by the fault of the owner or master of the ship may take place, which may operate most unpropitiously upon the merchant. Such are the delays by contrary winds, as that the best planned voyages are often frustrated. Such may be the case of an embargo. Such was the case in Palmer v. Lorillard, 16 Johns. 348, cited by the counsel in the

case at bar. Palmer and others had undertaken to carry some tobacco from Richmond to New York for Lorillard and the ship sailed upon the voyage in February, but, finding the Chesapeake blockaded, she returned to Richmond. Lorillard there demanded his goods in September, but the master refused to deliver them without being paid half his freight, and in a few days the vessel and cargo were totally lost in a storm at the wharf, and the court held in that case that the contract was only suspended by the blockade, and that the owner of the ship might detain the goods until they could prosecute the voyage in safety, unless the merchant would pay full freight. There the delay was three times as great as would have been sustained by the plaintiff in the case at bar if he had repaired his ship." And in conclusion the court said: "But we are satisfied that the master lost the freight by his own act in giving up the voyage. He had an interest in carrying the cargo which he was not obliged to abandon on account of the accident that happened to the ship. He might lawfully have insisted upon detaining the goods while the repairs could have been made, which it seems to us could have been made in a reasonable time." The case of Allen v. Insurance Co., 44 N. Y. 437, is peculiarly in point. The vessel in that case was stranded, and afterwards prevented from completing her trip by the ice. The case is, if anything, stronger than the one at bar, for the court said that but for the detention by stranding she would have been able to finish her voyage before cold weather could have prevented its completion. But it is by no means certain that, had the Eclipse not been temporarily detained while repairs made necessary by running upon a snag were being made, she would have succeeded in reaching Ft. Buford before the ice could have stopped her progress. She was detained only from 5 o'clock in the afternoon until 8 the next morning, and it was undisputed that she always lay by at night. Therefore, little, if any, time was lost because of this accident. In the case cited the court held that the master had a right to complete the transportation on the opening of navigation to earn his freight, and to hold the cargo for that purpose unless paid full freight by the shipper. The court said, (page 443:) "Detention by the close of naviga-

tion, which is the act of God or *vis major*, not accompanied by any accident or injury to the vessel, does not have the effect to terminate or dissolve a contract of affreightment. The owner or master of the vessel is not absolved from his liability to the shipper, nor can the latter demand his goods free of freight on account of the detention." To same effect, Murray v. Insurance Co., 4 Biss. 417, where the court said: "When a vessel takes a cargo, as in this case, in the fall of the year, to transport to a distant point, it is one of the incidents of the navigation that owing to variable weather or freezing up she may not be able to reach her port of destination." Declaring the same principles are Hadley v. Clarke, 8 Term. R. 259; McGaw v. Insurance Co., 23 Pick. 405; Allen v. Insurance Co., 44 N. Y. 437-443; Hubbell v. Insurance Co., 74 N. Y. 246; Hughes v. Insurance Co., 100 N. Y. 58, 2 N. E. Rep. 901, and 3 N. E. Rep. 71; Griswold v. Insurance Co., 1 Johns. 205, 3 Johns. 321; Pars. Shipp. & Adm. 231-233; Jordan v. Insurance Co., 1 Story, 342; The Nathaniel Hooper, 3 Sum. 542-559; Bradhurst v. Insurance Co., 9 Johns. 17; Insurance Co. v. Butler, 20 Md. 41. The master is sometimes bound to forward the goods by other means in case of an interruption of the voyage, instead of delaying to repair. Saltus v. Insurance Co., 12 Johns. 107; Treadwell v. Insurance Co., 6 Cow. 270; Bryant v. Insurance Co., 6 Pick. 131; Adams v. Haught, 14 Tex. 243; Schieffelin v. Insurance Co., 9 Johns. 21. But these were all cases in which the voyage was unexpectedly delayed. In this case both parties must have anticipated that the closing of navigation might intervene, and suspend the voyage. No time for delivery having been specified, no provision for forwarding by other means in such a contingency having been inserted in the agreement, and the contract being to ship all the way by water, it is not a case for the application of the doctrine that delay must be prevented by forwarding the goods by other conveyance. The law, in the light of these circumstances, writes into the compact an assent to such a delay. See Saltus v. Insurance Co., 12 Johns 107; Allen v. Insurance Co., 44 N. Y. 437. It cannot be said that the master by removing the cargo from the steamer to the river's bank, had abandoned the transportation of the goods. This was

done for the safety of both the vessel and the cargo, and was essential to their safety, as it is undisputed that the risk to both from the breaking up of the ice in the spring would have been greater with the steamer loaded than with the cargo on shore. It was the undoubted duty of the master to do precisely what he did do to protect the interests not only of the owner of the cargo, but the owner of the boat also. "Suppose a ship meets with a calamity in the course of a voyage, and is compelled to put into a port to repair, and there the cargo is required to be unloaded in order to make the repairs or to insure its safety or ascertain and repair the damage done to it, would such an unloading dissolve the contract for the voyage? Certainly not." Per Story, J., in The Nathaniel Hooper, 3 Sum. 542-559. See, also, Murray v. Insurance Co., 4 Biss. 417. We hold that full freight was earned.

But the plaintiff's right to maintain this action is challenged. It is insisted that he is not the proper person to sue for such freight. The action stands on a written contract of affreightment. We must look at it to discuss this point intelligently. It is in the following form: "Bismarck, D. T., Nov. 3, 1880. Capt. W. Braithwaite, Steamer Eclipse—Dear Sir: On your accepting this proposition we agree to give you $1.75 per one hundred pounds from Bismarck to Ft. Buford on freight up to the amount of one hundred tons, and all over and above one hundred tons $1.50 for one hundred pounds; receipt to be equal to one hundred tons to Buford; freight to be paid on receipt of bills of lading by draft at ten days' sight on Jos. Leighton, St. Paul. Yours, etc., J. C. Barr, Agt. for H. C. Aikin, Jos. Leighton and Benton Line." Across the face of this the acceptance of the proposition was endorsed in the following words: "Str. Eclipse, W. Braithwaite, Master." Can the plaintiff maintain this action upon this contract? Our statute, taken from New York, provides that an action may be brought in the name of the trustee of an express trust alone, and that every person in whose name a contract is made for the benefit of another is such trustee. § 4872, Compiled Laws. In view of the construction placed upon this legislation it is unimportant whether we consider this as a contract in which the words of agency are merely descriptive of the person contracting or whether we regard the

writings as disclosing the fact that 'plaintiff was contracting for other parties. In either case he was in fact contracting in his own name for the benefit of others. The proposition was that "on your accepting this proposition we agree to give you," etc. It was addressed to plaintiff, and by him accepted. That paintiff under the statute could sue upon such contract in his own name is placed by the authorities beyond the realm of debate. In Iron, etc., Co. v. Lundberg, 121 U. S. 451, 7 Sup. Ct. Rep. 958, the agreement on which the action was founded provided, so far as is material to this point, as follows: "I, Gustave Lundberg, agent for M. N. Hogland's Sons & Co. of Stockholm, agree to sell," etc. The court ruled that Lundberg could sue upon it in his own name. The court, after quoting the New York statute, couched in the same language as that of this state, and after stating that that statute controlled, as the case arose in the southern district of New York, said: "The case then stands thus: If the agreement to sell is an agreement made by Lundberg personally, and not in his capacity of agent of the Swedish firm, the price is likewise payable to him personally, and the action on the contract must be brought in his name even at common law. If, on the other hand, the agreement must be considered as made by Lundberg not in his individual capacity, but only as agent and in behalf of the Swedish firm, and for their benefit, then the price is payable to him as their agent and for their benefit, in the same sense in which an express promise to pay money to him as the agent of that firm would be a promise to pay him for their benefit; and therefore, by the law of New York, which governs this case, an action may be brought in his name. In either view, this action is rightfully brought." To same effect are McLaughlin v. Bank, (Dak.) 43 N. W. Rep. 715; Considerant v. Brisbane, 22 N. Y. 389; Ludwig v. Gillespie, 105 N. Y. 653, 11 N. E. Rep. 835.

The appellants Thomas C. Power and John W. Power next urge that the court erred in directing a verdict against them, claiming that the question of their liability on the contract was, under the evidence, a question of fact. We cannot give our assent to this proposition. These appellants were held, if at all, by the signature of the words "Benton Line" to the contract by

J. C. Barr. Whom were these words intended and understood to bind? Had Barr authority to bind such persons by such an agreement? Is there any conflict on these points? T. C. Power, one of the defendants, was examined on the trial, and testified that three steamers named "Helena," "Butte," and "Benton" together constituted and were known as the "Benton Line" on the Missouri river during the season of 1880; that he and John W. Power were part owners of all of these steamers, and that they were run during that season "for the benefit of the owners in every point and place." John C. Barr testified that he was in 1880 general agent for the "Benton Line," and that T. C. Power and John W. Power, with others, authorized him to bind them by signing the words "Benton Line" to contracts of this character; that he intended to sign for the three steamers named constituting the Benton Line when he signed the words "Benton Line" to the contract in question. Barr was defendants' own witness. T. C. Power testified that Barr was general agent of the Benton Line in 1880. I. P. Baker, one of defendants' own witnesses, on direct examination was asked this question by defendants' counsel: "When I speak of who constituted the Benton Line I refer to the Benton Line, whose name, or the name of which, is subscribed to the contract here. Now, who constituted that line?" To which inquiry he made the following reply: "The steamer Butte and her owners, the steamer Helena and her owners, and the steamer Benton and her owners. They constituted the Benton Line. The boats operated jointly constituted the Benton Line." This brief review of some of the evidence discloses that there was no controversy as to certain facts, and these facts were that the owners of these three steamers were operating them jointly under the name "Benton Line" during the season of 1880 on the Missouri river; that John C. Barr was their general agent, authorized to bind them by such a contract as the one made with plaintiff, and that he signed this contract for the purpose of binding this association of boats and owners. It is undisputed that this freight was transported by the Eclipse for and in the place of one of these steamers— the Butte. The unavailing efforts of the defendants to show that there was another enterprise at that time conducted under

the name of "Benton Line," or popularly so called, presents no error. It was entirely immaterial how many other business concerns by that name were operated at that time, there being no offer to show that it was on behalf of such other Benton line that Barr made the contract. His evidence that he executed it on behalf of the one in which defendants were interested is undisputed, and must therefore be taken as conclusive. He distinctly testified that the defendants Power and others authorized him to bind them by signing "Benton Line" to contracts: This disposes of a great many of the numerous assignments of error in the case. Did the operating of those three steamers jointly for the benefit of all the owners render them all liable on the contract in this case? If they were all liable, then defendants T. C. and J. W. Power cannot complain at this stage of the case that they only were sued, for the time to insist that all the other owners should be joined was when the answer was served by plea in abatement. Such a defense is purely dilatory, and is waived both at common law and under our statute, if not specially pleaded. Comp. Laws, §§ 4909, 4912, 4913; Barry v. Foyles, 1 Pet. 316; Moore v. Bank, 13 Pet. 311; Manufacturing Co. v. Kimberly, (Minn.) 33 N. W. Rep. 782; Davis v. Choteau, (Minn.) 21 N. W. Rep. 748.

We hold that the owners running these boats jointly for their mutual benefit were copartners in that business, and were all liable as such on the contract made in the prosecution of that business by their agent on their behalf. §§ 4028, 4072 Comp. Laws. There is still another ground of liability under the undisputed evidence. The owners of these boats, by running them under the name of "Benton Line," held out to the world that they were engaged in a joint venture for joint profit. Each vessel was not operated separately. To the outside world there appeared to be an association of boats, bound together by a common interest, operated under a common control, and in a common name. The owners of these boats, in whose interest they were managed, knew that an appearance of partnership was created by their conduct. On this rests an estoppel. Ordinarily another element is necessary to create a partnership liability by estoppel. It is generally essential to be shown that the per-

son dealing with the parties took the appearance for the fact. He must have been misled. But in a very similar case it was ruled, and we think correctly so ruled, that where the holding out is as conspicuous and long-continued as it was in this case, the law presumes that the business world deals with the parties as partners in fact, or as joint traders. It appears that all these boats had been operated for two seasons—1879 and 1880—before making this contract under this name and in this manner; the contract having been made near the close of the season of 1880; that two of them were so operated during the year 1878, and that one of them had been run in this name since 1875. No contract on behalf of these boats was made, so far as the record discloses, in the name of any of the boats or of the persons operating her. On the contrary, it appears that several of such contracts with the plaintiff were made under that name. The decision in Sun Mut. In. Co. v. Kountz Line, 122 U. S. 583, 7 Sup Ct. Rep. 1278, is in point. Four transportation companies having permitted their boats to be placed before the public as being engaged in the same business and as constituting the Kountz line, each company was held liable for the negligence of those placed in charge of one of the boats. The court said: "As there is no evidence of any direct representation by these transportation companies, or any of them, to the shippers of the cargo in question as to their relation in business with each other, or as to their relations, respectively, with the Kountz line corporation, the inquiry in this case must be whether they so conducted themselves with reference to the general public as to induce a shipper acting with reasonable caution to believe that they had formed a combination in the nature of a partnership or were engaged as joint traders under the name of the Kountz line. In our judgment it must be answered in the affirmative. It could not, we think, be answered otherwise consistently with the inferences which the facts reasonably justify." See, also, Bostwick v. Champion, 11 Wend. 571; Champion v. Bostwick, 18 Wend, 175.

Objections were made to the reading of the deposition of John C. Barr, taken on behalf of the plaintiff. Whether the court erred in receiving the deposition it is unnecessary to decide, for

the same witness was subsequently called by the defendants, and his testimony on this examination was as we have already stated it. Eliminating the deposition from the record does not at all affect the case. There was, therefore, no reversible error. The plaintiff was asked if he did not in another action against the steamer Eclipse, in which he was claimant, claim that the total earnings of the steamer for the season of 1880 was $8,000, which included the amount for which plaintiff was prosecuting this action. Objection to this inquiry was sustained. We find no error in this. The witness was not asked whether he claimed this money in that action. He was merely asked whether he did not claim that the steamer's earnings were a certain sum. But a mere claim of this money in another action would constitute no defense in favor of those who owed it. Nor would payment of the money by a stranger, nor a recovery of it from a stranger, necessarily inure to the benefit of those who were in fact liable. Moreover, no such defense was pleaded, and the evidence was properly rejected as not being within the issues.

It is next insisted that the court erred in rendering a joint judgment against the surviving defendants and the administrator of the deceased defendant, Leighton. It was undoubtedly the common-law rule that the representatives of a deceased debtor could not be joined with the surviving debtors in the same action whether the defendants were jointly or jointly and severally liable. Pecker v. Cannon, 11 Iowa, 20; Bank v. Mott, 27 N. Y. 633; Bank v. Howland, 42 Cal. 129; New Haven, etc., Co. v. Hayden, 119 Mass. 361. Whether the Code has changed this rule it is not necessary to decide. Assuming that, on proper objection being made, the action, upon the death of Leighton, should have been divided, and plaintiff, upon reviving the action against the administrator of the estate of the deceased defendant, under § 4881, Compiled Laws, should have proceeded against such administrator in a separate action, it is now too late for the surviving defendants to raise this point. No objection was made to continuing the action against all parties jointly in the original suit until after trial and verdict. The defendants, under such circumstances, must be deemed to have waived the objection.

Conceding that two separate judgments should have been rendered on the verdict—one against the surviving defendants, and another against the administrator—payable out of the estate in due course of administration, still the error in rendering only a single judgment is one of form, and not of substance, and is therefore not reversible error. The rights of the parties under the law are settled by the judgment rendered in the same manner in which they would have been settled had two separate judgments been entered. On the judgment against the survivors executions could have been issued forthwith, while the judgment against the administrator merely fixes the fact and the amount of the liability as the statute provides, the claim to be paid only in due course of administration. Compiled Laws, § 5802. Our statute provides that "the court shall in every stage of an action disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party, and no judgment shall be reversed or affected by reason of such error or defect." Id. § 4941. Acting under a statute precisely the same, the court in Decker v. Trilling, 24 Wis. 610, held in accordance with our views on the same question, saying: "It is a beneficent statute, designed to reach to just such a case as this. It is a matter of no consequence to a party separately liable to a judgment that some other person is included with him in the same judgment. It does not injure him in the least, but must be regarded as beneficial, rather than otherwise." See, also, Eaton v. Alger, 47 N. Y. 345. In California, in the case of Bank v. Howland, 42 Cal. 129, the single joint judgment against all was merely modified by inserting a clause directing that the judgment, so far as it affected the administrator, should be payable out of the estate in due course of administration. As to the surviving debtors it was affirmed. This case appears to be an authority warranting the entry of only a single judgment against all the defendants, provided it is restricted in its operation so far as the representative is concerned, so that it can be enforced only through the administration of the estate, and not by execution. This was held proper in Lawrence v. Doolan, 68 Cal. 309, 5 Pac. Rep. 484, 9 Pac. Rep. 159. See, also, Eaton v. Alger, 47 N. Y. 345; Grocer Co.

v. Johnson, 50 Ark. 62, 6 S. W. Rep. 231; Braxton v. State, 25 Ind. 82; Myers v. State, 47 Ind. 293. Should we hold that the obligation of co-partners is several as well as joint under our statute, it is possible that we would reach the conclusion that under the provisions of our Code there was no error even in form in the judgment. The objection to proceeding against the survivor and the representative of the deceased was that a joint judgment could not be rendered against them, and there was no power in the court to render several judgments in the same action. But under the reform system such practice it seems is permitted. §§ 4901 subd. 3, and 5096. Comp. Laws; Burgoyne v. Trust Co., 5 Ohio St. 586; Parker v. Jackson, 16 Barb. 33; Arthur v. Griswold, 60 N. Y. 143–145. Nor is the plaintiff any longer bound to treat all the defendants either as jointly or as severally liable, and proceed against each separately or all jointly. He may sue all or any number in the same action, when they are severally liable. § 4880 Comp. Laws. The action under such a system is treated as embodying a separate claim against each defendant, all bound together in the same proceeding. Burgoyne v. Trust Co., 5 Ohio St. 580. Whether the debt of a partnership is joint only or joint and several we do not determine. See §§ 3425, 3574, 4051, 4901, subd. 4 Comp. Laws.

Even without statutory change a partnership obligation, though only joint at law, is in equity, for the purpose of preventing a discharge of the estate of a deceased partner from liability, regarded as joint and several. All the cases agree that the representative of the deceased partner may be proceeded against in equity, and only in equity; but some of them rule that the action will lie against him only after it appears that the survivors are insolvent, or after the remedy against them has been exhausted, while others hold that the action may be brought immediately, and without proving such insolvency. See Doggett v. Dill, 108 Ill. 560. The obligation of a partnership being joint and several only in equity, and the representative being liable only in that forum, it might with some force be urged that for that reason the representative and the survivor could not both be proceeded against in an action at law. But

no question of this kind was raised in this case until after trial and verdict, and the representative of Leighton voluntarily assumed the defense. Said the court in Sherman v. Kreul, 42 Wis. 33-39, in which this precise question was involved: "Here the administrators saw fit to waive the equitable forum, and asked and obtained leave to litigate the liability of the estate in a court of law. Should they now be permitted, after having thus asked leave to defend, to turn around and say that the action can only be prosecuted against the surviving partners? It seems to us that they must abide by the forum which they have chosen, and that it is too late to make the objection that the remedy against the estate was in equity." We refrain from deciding these questions, because they were not fully argued. It would certainly seem more consonant with our system of procedure that the survivors and the representatives should be proceeded against in the same action. There has been a change of front. Form no longer dominates as in the past. It is made subservient to the speedy, direct, and simple attainment of the right in litigation. In this light should statutes regulating procedure be interpreted, not forgetting, however, that violence must not be done to the language employed, and ever mindful that reasonable regulation of procedure is essential to the due administration of justice.

The jurisdiction of the district court of the sixth judicial district of this state to render the judgment appealed from is next challenged. The action had been tried and the verdict rendered in the district court of the territory of Dakota prior to division and admission; but before judgment was obtained the territorial district court had ceased to exist. Benner v. Porter, 9 How. 235. North Dakota had become a state, with a complete judicial system of her own. The court which rendered the judgment is the court of original jurisdiction under the state constitution, and was made the successor of the territorial district court by the enabling act, § 23. The command of that act was that cases such as was the one at bar should, when pending in the district court of the territory at the time of admission, be proceeded with in the state forum of original jurisdiction in due course of law. The territorial courts having been

courts of the United States, it was competent for congress to legislate touching the transfer of their records, and of the proceedings pending therein at the time of admission. Said Chief Justice Taney, in Hunt v. Palao, 4 How. 589: "The territorial court of appeals was a court of the United States, and the control over its records therefore belongs to the general government and not to the state authorities; and it rests with congress to declare to what tribunal these records and proceedings shall be transferred," etc. If, as seems to be asserted in Benner v. Porter, 9 How. 235, the assent of North Dakota to the transfer of such jurisdiction was necessary, that assent was clearly manifested by accepting statehood under the enabling act, which provided for such transfer. See, also, § 1 of schedule to constitution. We hold that the state court had jurisdiction of the case and power to render the judgment. Defendants further assail the judgment so far as the intervenors are given rights therein. The intervention was without objection, so far as the defendants are concerned. They never answered the complaint in intervention, and we cannot see what possible prejudice has resulted or can result to them from the clause in the judgment directing that a portion of the recovery be paid to the intervenors. It in no manner increases the liability of the defendants. It merely diverts a portion of the recovery from plaintiff to the intervenors. This is a matter between him and them exclusively. See Speyer v. Ihmels, 21 Cal. 281-284, where the court say: "The objection that the judgment should not have directed the money in the sheriff's hands to be paid to the intervenors *pro rata* cannot avail the appellant, because it is a matter in which he is not interested; and those who are interested in it have not appealed." We have with great labor studied the record of about 500 pages, and the numerous errors assigned, without finding reversible error, and the judgment of the district court is therefore affirmed. All concur.