HOLLAND *v.* SEVEN HUNDRED AND TWENTY-FIVE TONS OF COAL, (SUN-DERLAND & RUCKER, Claimants.)

(*District Court, E. D. Wisconsin.* December 4, 1888.)

1. SHIPPING—CARRIAGE OF GOODS—DELAY—FREIGHT.

A vessel agreed to carry coal to M. during the season of navigation, if possible, and sailed with a barge, carrying part of the cargo, in tow. The crew then lacked three men, to supply whom the vessel stopped at several ports, losing about a day. Afterwards, on the ground that the windlass of the barge was broken, the vessel put back about 65 miles to a port of refuge, instead of going forward to a similar port on her course. On resuming the voyage a gale was encountered, and the vessel put into port for the winter. The master telegraphed the consignees that the vessel was frozen up, and in answer to their reply said, "Weather too cold for open boat." Navigation was still open and the voyage could have been completed. The master knew then, while waiting for instructions from the owners, that a vessel bound for the same port had passed on her way. *Held,* that the master acted in bad faith. and was not entitled to the extra freight agreed on, but only to the highest rate paid when the delivery was made the next spring.

2. SAME—DELAY—SPECIAL DAMAGE—NOTICE.

Notice to the ship-brokers, given long before the shipment, that claimants wanted the coal to deliver under a contract with a third person, will not render the vessel liable for the expense of procuring other coal in fulfillment of the contract.

In Admiralty. Libel for subtraction of freight.

*George D. Van Dyke,* for libelant.

*George C. Markham,* for claimants.

JENKINS, J. This is a libel for subtraction of freight-money for the carriage of a cargo of coals. The steam-barge Westcott, a single-deck vessel, owned by the libelant, at Cleveland, on Tuesday, the 16th day of November, 1886, contracted with the consignors of the claimants to carry a cargo of coal from Sandusky to Milwaukee, for the freightage of $1.35 per ton. A similar agreement was on the same day made with the barge Middlesex, also a single-decker, which vessel was to be towed by the Westcott, the latter to receive from the former for such service one-third of the gross freight-money earned. The vessels were to have "quick dispatch" in loading, contingent upon their arrival at Sandusky by Thursday, the 18th November. A like agreement was made by the consignors at Cleveland, on the same day, with the Wall, a single-deck barge, except that she should arrive at Sandusky on the 20th November. This vessel was to be towed by the Cormorant, a double-deck steam-barge. But two ves-

sels could be loaded at a time at the docks at Sandusky.   On Thursday, the 18th, the shippers had some 1,900 tons of coal at the docks, a sufficient supply for the Westcott and Middlesex, and expected to give such dispatch in loading that they would be able to receive cargo and give place to the Wall upon her arrival on Saturday.   At the time of the contract the Westcott was on the dry-dock at Cleveland for repairs.   She, with her consort, did not arrive at the docks at Sandusky until Sunday, the 21st November.   The Wall arrived at Sandusky on Saturday, the 20th, and commenced to load.   Her bill of lading bears date the 23d November.   She had completed her loading on or before that date.   The Westcott and Middlesex commenced to load at 1:30 of the 23d, and continued until 9:30 A. M. of the 24th, then suspending for lack of coal until the morning of the 25th, when work was resumed, and three or four car-loads put on board.   Then work was again suspended for lack of coal until 3 P. M. of that day, when, with an abundant supply, the loading was resumed, and completed at noon of the 26th, and bills of lading bearing that date, and in the usual form, were executed and delivered. The cargo of the Westcott was 725 tons, of the Middlesex 1,097 tons, and of the Wall 1,035 tons.   The detention upon the 24th and 25th was incident to the inability of the shippers to get proper dispatch from the mines by reason of some blockade upon the railways.   The Westcott, with her consort, the Middlesex, sailed from Sandusky at 2 P. M., November 26th.   The Wall, from the 23d, was at anchor, waiting for the Cormorant, and did not leave Sandusky until after the Westcott, but when thereafter is not disclosed by the evidence.   Upon starting, the Westcott was short three men of her usual complement of crew.   She proceeded with due dispatch to Detroit, where she arrived at 12 P. M., November 26th.   She there remained until 7 A. M. of the 27th, for the purpose of completing her crew, but, failing therein, proceeded, and for a like purpose put into Marine City, at 2:30 P. M. of that day.   She there obtained two men.   A snow-storm prevailed during the night. At what hour the men were obtained, and when the storm commenced, is not disclosed.   She departed from Marine City at 4 A. M. of the 28th; arrived at Port Huron at noon, delaying there one hour to obtain and obtaining a seaman, thus completing her crew.   Proceeding into Lake Huron, she passed Sand Beach at 8.15 P. M., and at midnight of the 28th, in the midst of a thick snow-storm, with a south, moderate wind, was averaging a speed of eight miles an hour.   In the early morning of the 29th the wind veered to the N. W., and at 4:30 A. M. was blowing a gale.   At 6 A. M., when off Sturgeon Point, the Westcott turned on her course, and made for Tawas, 35 miles to the south, for shelter, arriving there at 11 A. M.   Here, the master affirms, the Middlesex discovered her windlass to have broken, and it was deemed unsafe for her to proceed further on the voyage; that there were no means of repair at Tawas; that the Middlesex could not get in behind the docks there, and it was unsafe for her to lay outside because of insufficient depth of water; and, being unable to obtain a tug, it was determined to return to Sand Beach, a harbor of refuge, 65 miles to the south.   The Westcott, with the Mid-

dlesex in tow, left Tawas at 9 P. M. on the 29th, on abatement of the storm, arriving at Sand Beach at 7 A. M. of the 30th. Here a tug was obtained to tow the Middlesex back to the river, and the Westcott proceeded for Milwaukee at 1:30 P. M., with a light wind from the N. E. Thence, without difficulty, she pursued her voyage, passing Cheboygan at 8:15 A. M. of December 1st, arriving at St. Ignace at 11 A. M., where, compelled by a north-west gale, she remained until 12 P. M. of December 2d, when she proceeded with a light north wind until abreast of the north point of the South Fox. At 7 A. M. of December 3d, the wind veered to the N. W., and was working a gale. She turned about, and returned on her course, arriving at Cheboygan at 2:30 P. M. of that day. Here there was found to be six inches of ice in the harbor inside, but the Westcott went in along-side the docks without difficulty. The master from this point at once wired the owner for instructions, and wired the consignees of the cargo that he would lay the boat up, and proceed no further that season. The log discloses that on December 4th the weather was pleasant and calm, the thermometer at zero, and on the 5th, at 6 A. M., the weather was cold, accompanied by a south, fresh wind. At 4. P. M. of the 5th the master received directions from the owner to either return to Marine City, the home port of the vessel, or to lay up at Cheboygan, as his judgment should dictate. On the 6th December, the weather continuing fine, the master commenced to strip the vessel, paid off the crew, and on the evening of the 7th, having completed the stripping of the vessel, left for home. The Cormorant, with the Wall and another single-deck barge in tow, passed Cheboygan on the 6th, to the knowledge of the master of the Westcott, arriving at Milwaukee on the 8th of December. The weather remained good for some 10 days after December 5th. In the spring of 1888, and on the 24th April, the Westcott resumed her voyage, encountering and being detained by floating ice, and arriving at Milwaukee on the 26th April, delivering her cargo to the claimants upon receiving freight at the rate of 80 cents per ton, the going spring rate, preserving, however, the lien of the vessel upon the cargo for such further amount as it might appear should be justly paid.

The claimants insist (1) that the agreement with the Westcott was a time contract, the cargo to be delivered in any event before the close of navigation; (2) that the voyage was intentionally delayed; that the cargo should properly have been delivered before close of navigation, and by reason of failure therein the vessel was only entitled to the highest rate of freight at the time of delivery; and (3) that they purchased large quantities of coal, of which the cargoes of the Westcott and Middlesex were part, in fulfillment of a contract with the Wisconsin Central Railroad Company, requiring delivery to be made during the winter of 1886–1887, of which the Westcott at the time of the agreement with her had notice; that by reason of her failure to transport and deliver according to her contract, the claimants were compelled to purchase other coal in fulfillment of their contract with the railway company, at largely increased prices, and to convey the same from the mines to the places of delivery by rail, at rates of freight greatly in excess of the rate contracted

to be paid the Westcott; and seek to set off the damages so sustained against the claim of the libelant.

It was undoubtedly, as stated by the master of the Westcott, the intention of all parties that the cargo should be delivered at Milwaukee before the close of navigation. The master affirms that he took the coal to so deliver it, if he possibly could. The high rate of freight contracted to be paid leaves no room for doubt upon that subject. Such a state of facts does not, however, establish a time contract to deliver by a certain date, and at all hazards. There was no conversation upon the subject with the master, by any one, and no evidence of such a contract. It becomes unnecessary, therefore, to consider the question raised at the bar, whether a bill of lading is such a contract that, being silent as to time of delivery, a prior parol agreement of the carrier for delivery by a certain date can be imposed upon it. There was here no such parol agreement. The circumstances adduced—however strong to point the duty of the vessel with respect to avoiding all unnecessary delay on the voyage—do not warrant the claim in that behalf.

The delay of the Westcott in arriving at Sandusky, although unavoidable, could not avail her to insist upon quick dispatch. There was coal sufficient to load both the Westcott and the Middlesex had they arrived at the stipulated date. By reason of their delay and the prior arrival of the Wall, sufficient of the cargo intended for the other barges was properly given to her. The shipper was not required to await their tardy arrival. The vessels, however, had the right to ordinary dispatch. They were denied that right. The shipper engaged to have 2,900 tons of coal ready for loading the three vessels by the 21st. Therein he failed. But as only two vessels could be loaded at the dock at a time, and the Wall, under the circumstances, properly had the preference, the shipper is not chargeable with detention until the 23d. There was thereafter a delay of a day and a half. The cargo, however, was received, and bills of lading executed and delivered. The prior delay on either side is not material. By the receipt of cargo and delivery of bill of lading a legal duty was imposed upon the Westcott not to be avoided by any prior misconduct of the shipper. She then engaged, the bill of lading being silent as to time, to deliver her cargo during that season of navigation, if it could be done, with a staunch vessel, a proper crew, and without unnecessary delay. Any liability or excuse for non-performance must be predicated upon events occurring subsequent to the receipt of cargo.

The Westcott was at fault at the outset of her voyage. She was insufficiently manned. A carrier by water is bound to provide a seaworthy vessel, "capable of resisting the external forces to which it is subjected in the ordinary course of navigation," (*The Northern Belle*, 9 Wall. 526,) and equipped with the necessary officers and crew. The vessel is not seaworthy if there be a failure to provide a proper crew. *The Planter*, 2 Woods, 490. The omission to furnish such a crew occasioned certain delays on the way, in efforts to obtain seamen. If those delays of themselves prevented a delivery of the cargo during the then season of navigation, the Westcott is chargeable for such damages as naturally and

proximately resulted from such non-delivery. She would also be so liable, although such delays did not alone prevent delivery, if they operated effectively, in connection with other default of the master, to work a breach of contract to deliver.

It is first to be ascertained what delay, arising from want of a sufficient crew, is justly chargeable to the Westcott, and the effect of that delay upon her failure to deliver during that fall. There was a conceded delay for that cause of seven hours at Detroit, and of one hour at Port Huron. She stopped at Marine City to obtain men, and there remained from 2:30 P. M. of the 27th November until 4 A. M. of the 28th, a period of 13½ hours. It is claimed for the libelant that the vessel is not justly chargeable with the entire time of detention at that port, upon the ground that most of the delay there was occasioned by a snow-storm, which prevented her departure. It is true that the navigation of the river St. Clair is by means of ranges on shore by day, and of lights on shore at night, and that it was proper for the Westcott not to proceed in that storm; but, had she performed her duty, and shipped a proper crew at the outset of the voyage, she would not have had occasion to stop at that port. The necessity of detention there was imposed upon her by her own fault. If there had been no stoppage at Detroit, Marine City, or Port Huron, the Westcott would have passed out of the river and into Lake Huron, by 3:30 P. M. of the 27th, and before the snow-storm commenced. In the open lake there existed no occasion for delay upon that acount. The vessel should therefore be charged with the whole of the delay at Marine City. The aggregate of the detention in the river, chargeable to the Westcott, is 21 hours and 30 minutes. The time actually consumed in making the distance from Detroit to Cheboygan, according to the vessel's log, was 41½ hours. Leaving Detroit November 26th, at 12 P. M., as she should have done if she had left Sandusky with a full complement of men, she would have arrived with her consort at Cheboygan on the 28th inst., before the gale of the 29th, which compelled her to put back to Tawas for shelter. Proceeding thence on her voyage, if, upon encountering the gale of the 29th, which set in at 4:30 A. M., she had returned on her course to Cheboygan for shelter, as was subsequently done, she would have arrived there at about the same hour she did arrive at Tawas, seeking shelter from the same blow. Leaving there on the abatement of the storm on the night of the 29th, at the same hour she left Tawas, she would have arrived at Milwaukee on the 1st of December, before the N. W. gale of that day, or would have so far progressed upon her course as to be able without difficulty to make the stiller waters of the west shore, finding shelter, if need be, at some one of the ports of refuge on that shore, ready to resume and complete her voyage on abatement of the storm.

On arriving abreast of the South Fox, the Westcott encountered a N. W. gale, and returned to Cheboygan. The master had determined upon turning about that he would attempt to go no further that season. He states the reasons for this decision to be that the boat was loaded with ice, the scuppers on deck, where the water ran off, were frozen, and the water would not run;

the decks and rigging were coated with ice; that he considered the season of navigation was closed, and that there was nobody but himself to judge whether it was fit to go or not, and he therefore laid the vessel up for the season. The master was in error in the conclusion that his judgment was final. He was not the sole arbiter of the necessity. This is not the case of sudden emergency, where error of judgment is not accounted fault. It would be intolerable if the master of a vessel charged with the duty of delivering during the season of navigation, if delivery could be effected by diligent effort, is to be the only judge of the time when effort should cease. If that were so, the obligations of contracts of affreightment would be of slight binding force, and the owners of cargo would be subjected to the mere caprice of the master. Such is not the law. It is for the court to determine whether the master was guilty of negligence in wintering his vessel under the circumstances, and at that time. His action, to be justifiable, should be had in entire good faith, and reasonable in view of his surroundings.

The vessel arrived at Cheboygan at 2:30 P. M. of the 3d December, finding six inches of ice in the still waters of the harbor, but proceeded to the docks without difficulty. The master at once wired the owner his determination to winter the vessel, and requested instructions. He received none until 4 P. M. of the 5th December, and commenced to strip the vessel on the 6th. During those three days the weather was pleasant, but cold. The Cormorant, with her tow of two single-deck barges, passed through the straits on the 6th, to the knowledge of the master of the Westcott, and arrived at Milwaukee on the 8th. This fact is not of itself controlling to charge the Westcott with negligence, (*Wilcox* v. *Five Hundred Tons of Coal*, 14 Fed. Rep. 49, 52,) but is a circumstance proper to be considered in connection with all the surroundings, as bearing upon the question of good faith. Pleasant weather continued for some 10 days thereafter. Beyond question the Westcott could have reached Milwaukee, had she left Cheboygan on the 4th, 5th, or 6th December. This fact, standing alone, is not decisive, but is to be considered. It has been well said that the event is always a great teacher. Possibilities are not the standard of judgment. The question is whether all that reasonable prudence required to be done under the circumstances was performed. *The Nevada*, 106 U. S. 154, 1 Sup. Ct. Rep. 234. The duty of the carrier is to carry safely, and to make timely delivery. Time is subordinated to safety, if both duties cannot be concurrently performed. A careful scrutiny of the evidence, however, fails to disclose any well-grounded apprehension of inability to safely carry. The vessel was staunch and strong. No injury had occurred to her through any peril of the sea. She had breasted the gales of the 29th November and of the 3d December, without damage. It is true the scuppers were frozen, and the decks and rigging were coated with ice. This is usual in all navigation in the fall. No effort appears to have been made to relieve the vessel in that regard, as might have been done, and no suggestion is hazarded that the safety of vessel or cargo was thereby endangered. The weather was more or less tempestuous. That was usual to the season of the year. The ves-

sel contracted with reference to that condition of things, and was to receive nearly double freight over spring and summer rates because of storms and tempestuous weather. The vessel owed diligence and promptitude in delivering. She was bound to diligent effort, and was obligated to deliver during that season of navigation, unless prevented by stress of weather, endangering the safety of the cargo, or preventing further progress. Exposure to inclement weather, or fear of encountering ice or cold, constitute no excuse. *The Maggie Hammond*, 9 Wall. 435. The season of navigation was not closed. The straits were open and unobstructed. There was no blockade preventing continuance of the voyage. She reached dock at Cheboygan without difficulty, in despite of ice in the still waters of the harbor. The engineer testifies, even, with respect to the storm of December 3d, that it was safe to operate the engine in that weather; "it would run all the time;" that the weather and ice furnished no obstacle to the progress of the boat. There is no good reason shown, preventing the Westcott from proceeding upon abatement of the storm of the 3d December. Fear of further foul weather furnishes no excuse.

There are circumstances indicating on the part of the master want of good faith,—a studied intention to palter with his duty. Upon the arrival of the vessel at Cheboygan, he wired the claimants, "Westcott froze up in Cheboygan. Will go no further." That was not true. He does not so assert in his testimony, and the engineer states to the contrary. He encountered no ice save that in the harbor of Cheboygan. In answer to his dispatch the consignees wired him, "Others are getting through, why can't you? We want the coal." To which the master replied on the same day, "Weather too cold for an open boat." This reply is a shifting of excuse for not proceeding, stamping the previous assertion as untrue. The excuse furnished no warrant for wintering the vessel. He had contracted to carry with respect to cold weather, and with respect to an open boat. He had demanded, and was to receive, a high rate of freight, predicated upon apprehended exposure to cold and tempestuous weather. It was not true that open boats could not proceed by reason of the cold. The Wall and another open boat did proceed in tow, and made safe and timely arrival.

At Marine City, on the second day of the voyage, the master of the Middlesex, then in tow of the Westcott, wired the shippers that both vessels could not get to Milwaukee; that if the Middlesex were released from the contract the Westcott could get through alone, and proposing to sell the Middlesex's cargo at Port Huron, and to accept river rate of freight. The Westcott was to receive for towage one third of the gross freight earned by the Middlesex. This message was sent with the knowledge of the master of the Westcott, and from her home port, the residence of the libelant. It is not to be presumed that the dispatch was forwarded without the assent of both owner and master of the Westcott. At the time the vessels had encountered no storm or heavy weather of any kind, and had but commenced the voyage. The reasons for such a message at such a time are not disclosed, and, unexplained, the act in-

dicates a disposition at the outset to evade a duty which demanded immediate and diligent action, not laggard performance, nor shuffling effort to evade.

It is claimed that at Tawas the windlass of the Middlesex was broken, and, from inability to obtain repairs there, and from want of a tug, it became necessary for the Westcott to tow her back to Sand Beach, a distance of 65 miles, where she could and did obtain a tug, which towed her to the river.    In so doing the Westcott lost some 21 hours of time. The accident to the Middlesex is not mentioned in the Westcott's log, and no reason is there assigned for her action.    The engineer of the Westcott confesses ignorance of the motive for the return.    Assuming, however, the fact to be as stated by the master of the Westcott, it is not established that the injury to the windlass of the Middlesex, whatever it was, in any way prevented her towage.    She was in fact towed back to the river.    It remains unexplained why she was not rather towed to Cheboygan, on the course to Milwaukee, and left there, if the injury rendered it imprudent for her to proceed further.    That was a harbor of refuge which could have been reached from Tawas by the evening of the 30th.    Whether or not the Westcott, thence proceeding alone, could have so far progressed upon her voyage before encountering the storm of December 1st as to have found shelter therefrom at a harbor of refuge on the west shore of Lake Michigan, proceeding on its abatement to Milwaukee, is not necessary to be determined.    The facts are stated as indicative of the want of recognition by the master of the character of his duty to make speedy delivery, and as giving color to his previous and subsequent conduct.

It was incumbent upon the Westcott to satisfactorily account for the non-delivery of her cargo during the season of navigation, and to clearly establish that non-delivery was properly attributable to causes beyond her control; not to her default.    The evidence satisfactorily discloses that with proper, diligent effort the cargo could have been timely delivered.    It convinces the judgment that, if there was not a studied attempt to procrastinate, there was exhibited a timidity of action, illy according with duty, preventing performance.    The general policy of the maritime law holds the master responsible for all unnecessary deviation or delay in the voyage.    It is in the interest of commerce that that policy should not be relaxed.    The carrier should be held to strict performance of his undertaking.    Contracting for high rate of freight in view of anticipated boisterous weather, he should not be absolved from his duty through apprehension of storms.    Every proper effort to deliver should be exacted, and inability to proceed should be clearly shown.    A strict rule of liability for delay removes all temptation to withhold delivery, constrains the master to active, vigilant, and courageous discharge of duty, and promotes commerce.    It imposes the motive of self-interest, which alone is adequate to secure the precision and punctuality necessary in all maritime transactions.    The libelant must be held accountable for the non-delivery of the cargo during the season of navigation.

Ordinarily, the measure of damages for delay in delivery is the differ-

ence between the value of the goods at the place of destination when they ought to have been delivered and when they were delivered, if there has been a decline in market value. This rule will usually indemnify the owner against the direct and natural consequences of the carrier's delay. It does not appear from the record that there was any decline in the market value of coals. Consequently this rule cannot be applied. It is asserted that the libelant should be held responsible for the expense incurred by claimants in procuring other coals by rail in fulfillment of their contract with the Wisconsin Central Railway Company. This claim proceeds upon the postulate that notice of that contract was given to the ship-brokers in the spring or summer preceding the shipment. If any such notice was given them,—which is doubtful,—there was none given the master of the vessel, and the brokers at the time of the alleged notice were in no sense the agents of the vessel. Notice of such a contract, to have the effect to create liability for more than ordinary damages, must be given under such circumstances as to make it a term of the contract that such damages are to be met in case of breach. *Horne.*v. *Railway Co.*, L. R. 7 C. P. 583, L. R. 8 C. P. 131. There is no evidence warranting the application of that rule.

The consignees, having only paid the going spring rate of freight, have sustained no damage. They would suffer injury if required to pay for tardy delivery the price agreed to be paid for speedy delivery To compel payment of more than the going spring rate of freight would work punishment to the innocent, and tender premium to wrong. The libelant, having failed in his duty, ought not to be compensated by a recovery of the price agreed upon for performance of that duty. This ruling is not predicated upon a supposed right of the court to scale the contract rate upon any notion of equity. Nor is it necessary to consider whether it was well decided in *Wilcox* v. *Five Hundred Tons of Coal*, 14 Fed. Rep. 49, that, delay being unavoidable, it was within the province of the court to scale the rate of freight upon the inference that the rate was based upon delivery during the then season of navigation. The decision here is placed upon another basis. The libelant seeks a recovery upon his contract, asserting performance. The contract was not performed. The stipulated freight was bottomed upon seasonable delivery. The libelant has made breach of contract with respect to the very thing which was the essential condition of the rate stipulated. Failing to duly perform, the stipulated rate of freight was not earned. Standing in breach of contract, he cannot recover upon that contract as for fulfillment of it. But, having made actual, though untimely, delivery, for the beneficial service rendered by him and accepted by the claimants, the law infers a promise, upon equitable considerations, to pay the reasonable worth of such service. This he may recover, not upon the contract, but upon an implied *assumpsit*. The libelant was paid the highest going rate of freight at the time of delivery. He is entitled to no more. The libel will be dismissed, with costs.