PHILADELPHIA & READING RY. CO. v. PEALE, PEACOCK & KERR, Incorporated.

(District Court, E. D. Pennsylvania. March 1, 1905.)

No. 67.

1. SHIPPING—CONTRACT FOR CURRENT RATE OF FREIGHT—DELAY IN DELIVERY.
A barge laden with coal to be carried from Philadelphia to Boston, which had started in tow, and proceeded down the river for two or three miles, when she was injured by floating ice, causing a delay in delivery, had entered upon the voyage, and was protected by a provision of the bill of lading excepting "accident or danger of the sea, river or steam navigation"; and, under a further provision of the contract by which she was to receive the market rate of freight, she was entitled to the rate current when the voyage was commenced, unless the delay was caused by her own negligence.

2. SAME—NEGLIGENCE IN BEGINNING VOYAGE—FLOATING ICE.
A barge laden with coal started on a voyage from Philadelphia to Boston in tow of a powerful steamship at a time when there was floating ice in the Delaware river. Two or three miles down the river, heavier ice was encountered; and in the first, unsuccessful attempt of the steamship to force her way through, the barge was injured, making it necessary for her to stop for repairs. The steamship then successfully passed through the ice, and proceeded alone. Held, under the evidence, that the condition of the river was not such as to render the barge negligent in starting, in view of the size and strength of the vessels; it being her duty to make every reasonable effort to deliver the cargo promptly.

In Admiralty. Suit to recover freight and demurrage.

James F. Campbell, for libelant.

John G. Johnson and J. Wilson Bayard, for respondent.

J. B. McPHERSON, District Judge. The respondents, who are coal dealers in the city of Philadelphia, made a contract with the libelant in January, 1903, by which the libelant undertook to carry a load of the respondents' coal in one of its seagoing barges from Philadelphia to Brookline, Mass., and the respondents agreed to pay the market rate of freight for this service. Accordingly the barge Kohinoor took on board 1,900 tons of coal, and began the voyage on January 18th, in tow of the steamship Harrisburg, a vessel also belonging to the libelant. The bill of lading agreed to deliver the coal at Brookline, "the restraint of governments, collisions, fire at sea or in port, or any other accident or danger of the sea, river or steam navigation, of whatever nature or kind soever, excepted." And it was also provided in the bill that:

"If a proper berth for said seagoing barge be not procured by consignee of said cargo, and the cargo be not discharged by him from the barge within five working days (dating from the hour that the barge is ready to deliver cargo), for each day thereafter, Sundays and legal holidays not excepted, 17 and 50/100 dollars per day demurrage will be charged."

When the voyage began, the steamship and the barge were seaworthy, and were properly manned, equipped, and supplied for the voyage. At that time some ice was running in the Delaware river at Port Richmond, from which point the tow started; and it was known by the libelant's officers and agents, and by the master of the Harris-

burg, that navigation below was obstructed to some extent, but the information they had on this subject did not indicate that there was serious danger to vessels as large and strong as the steamship and the barge. Near Washington Park, however, two or three miles down the river, ice of unusual thickness and in large quantity was encountered, and in the effort to force a passage the steamship stuck fast; and the barge, being unable to stop her way, came down with the ebb tide and collided with the steamship, doing her some damage, and injuring herself so severely that it became necessary to interrupt the voyage until the indispensable repairs should be made. The barge was partially unloaded, and was taken without delay to a shipyard, where the work of repairing the injury was prosecuted with diligence; but it was not until January 31st that the work was finished, and, as no power could then be had, it was not until February 5th that the voyage could be resumed. The barge reached Boston Harbor on the evening of February 10th, and the cargo was tendered to the consignee the next morning, but he refused to receive it because of the delay. The respondents were immediately notified of his refusal, and were asked for instructions; but they gave none until February 20th, when they directed the libelant to deliver the cargo at Portland, Me., and agreed to pay the extra charges for towing. The barge finally discharged at Portland on February 26th and was taken back to Boston; the service of towing to and from Portland being done by the Commercial Towboat Company at a charge of $205, as the libelant had no power of its own available at Boston when the direction to deliver at Portland was received.

When the voyage began, on January 18th, the current rate of freight was $2 per ton, but this was changed on January 27th to $1.50 per ton; and the principal subject of dispute is which of these sums furnishes the measure of respondents' liability for freight. There seems to be no controversy over the amount of demurrage that is due, $157.50. The towing charges between Boston and Portland are also objected to, apparently on the ground that libelant charged the same rate on cargoes of coal from Philadelphia to Portland as from Philadelphia to Boston; but, aside from the fact that this rate applied only to cargoes that were originally destined for Portland, the respondents' liability for the extra towage charges rests upon their express promise to pay them. This is found in the following letter, dated February 20th, and addressed to libelant's shipping and freight agent in Philadelphia:

"Dear Sir: In accordance with instructions from our Boston office, please deliver barge Kohinoor to Messrs. Sargent, Dennison & Co., Portland, Me. We will be responsible for towing bill in making this delivery.
"Yours truly, E. E. Walling,
"General Sales Agent."

The real contention, I think, must be over the libelant's alleged negligence in undertaking the voyage under the circumstances surrounding the navigation. It seems to me to be certain that the voyage had actually begun. I had occasion to consider this question recently in The Buckingham (D. C.) 129 Fed. 975, and some authorities on the subject will be found collected in the report of that case, to which may be added Wood v. Hubbard (C. C. A., 3d Circuit) 62 Fed. 757, 10

C. C. A. 623. This being so, the rate of freight then current, $2 per ton, applied to the venture, and must be paid, unless a sufficient excuse can be shown for the respondents' failure to comply with these terms. The bill of lading expressly protects the libelant from liability caused by dangers of the sea, river, or steam navigation, of whatsoever nature or kind; and, as the interruption of the voyage was unquestionably occasioned by a danger of river navigation, the contract relieves the libelant, unless its negligence has been shown. There was no fault in the work of repairing the barge; and the single question is, therefore, whether the presence of ice in the river made it negligent to begin the voyage at all. This is, of course, a question of fact, to be decided according to the evidence; and I need only state my conclusion after having considered all the testimony on this subject. In my opinion, the danger was not so great as to require the voyage to be postponed. Vessels as large and powerful as the Harrisburg are intended to encounter dangers, and I see nothing in the evidence to indicate that anything more than the ordinary peril from ice in the winter season was to be expected. When ice of unusual thickness was met, it was not practicable to turn around; and it was not negligence, I think, to attempt to break through. Indeed, the Harrisburg did break through in a second attempt the same day, and went on to Boston alone. The libelant's duty was to make every reasonable effort to take the cargo to Boston as speedily as possible, and, if the respondents had lost a market while the barge was waiting for the ice to move out, they would have been entitled to complain that no attempt had been made to open a channel by force. That the first attempt failed is true, but it was not negligence to make it, for the libelant must be judged, not by the result, but by the conditions that then existed. As was said in Holland v. 725 Tons of Coal (D. C.) 36 Fed., on page 790:

"The vessel owed diligence and promptitude in delivering. She was bound to diligent effort, and was obligated to deliver during that season of navigation, unless prevented by stress of weather, endangering the safety of the cargo, or preventing further progress. Exposure to inclement weather, or fear of encountering ice or cold, constitutes no excuse. The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772."

A decree may be entered in favor of the libelant, with costs.