GRAMMER S. S. CO. v. JAMES RICHARD-
SON & SONS, Limited.

JAMES RICHARDSON & SONS, Limited, v.
GRAMMER S. S. CO.

District Court, W. D. New York. December 18,
1929.

Brown, Ely & Richards, of Buffalo, N. Y., and Holding, Duncan & Leckie and Goulder, White & Garry, all of Cleveland, Ohio (John B. Richards, David S. Jackson, and W. Alexander Eldridge, all of Buffalo, N. Y., and F. L. Leckie, Arthur E. Petersilge, and Thomas H. Garry, all of Cleveland, Ohio, of counsel), for libelant.

Single & Single, of New York City, and Stanley & Gidley and Sanders, Dudley & Connelly, all of Buffalo, N. Y. (Forrest E. Single, of New York City, of counsel), for respondent.

HAZEL, District Judge. On December 12, 1927, at 10:20 p. m., the lake freighter J. G. Grammer sailed, under two charters and bills of lading, for the port of Buffalo, from Port Arthur-Ft. William, Ont., with a full

cargo of grain, 237,917 bushels, owned by the respondent, James Richardson & Sons, Limited, a Canadian corporation, and arrived at Sault Ste. Marie locks on December 14th, at 10:08 a. m. After passing through, her master saw many vessels, down bound, massed below the locks, and was informed by the government official in charge of channels and regulation of vessels in St. Mary's river, that he was sixteenth in turn, and that the down-bound channel, known as the West Neebish, was blocked by the steamer Eads, which was ice-bound. He was directed to tie up to the pier below the locks, and instructed to await the result of efforts to open the channel then under way by a representative of various owners of vessels also down-bound with grain cargoes. Three days later, on December 17th, libelant and other owners of detained vessels decided that the heavy ice conditions in the down-bound and up-bound channels made it hopeless to proceed further, and orders were given to lay up at the "Soo" with their cargoes for the winter—an order obeyed by the Grammer and her crew dismissed. Thereafter, on April 29, 1928, the Grammer, after her spring outfitting, left the Soo with her grain cargo for her destination, encountered 15 or 20 miles of ice outside of Buffalo, arriving in port on May 6th, five months after loading, and delivered the grain in good condition to Douglass, the consignee's agent.

The libel alleges a breach of contract of carriage arising from respondent's failure to pay the freight specified in the charters, amounting to $13,085.45, with interest. The proofs show that the specified rate of grain transportation, according to the bills of lading, was 5½ cents per bushel, appreciably higher than in the ordinary season of navigation, closing November 30th, and during continuance of normal insurance; that the current rate for grain on the arrival at destination concededly was 3 cents per bushel. The up-bound voyage from Buffalo was delayed two days by inclement weather on Lake Superior, and on arriving at Ft. William her shipping orders required proceeding to six different elevators for lading. At such time ice was forming in the harbor, necessitating the use of tugs for breaking through in going from one elevator to another. There was delay, without fault on the part of the steamship, until December 12th. Neither the charter nor bills of lading specified a time of delivery of the cargo at Buffalo, and the libel alleges that the steamship was delayed en route at Sault Ste. Marie by ice blockades in the channels, which rendered further progress impossible until the ensuing spring, and that

because of diligence exercised in prosecuting the down-bound voyage and bona fide efforts to make delivery of the cargo prior to the final close of navigation, the contract of affreightment was performed and libelant is entitled to the freight at the stipulated rate. It is also alleged that, in the event that freight is not recoverable under the contract, libelant is entitled to recover the reasonable value of its services at the amount of $13,085.46.

Respondent's cross-libel alleges that, even though the bills of lading and charters failed to specify the time of delivery of the grain, the various circumstances, to wit, the lateness of the season, the approach of winter, the severe weather, and the character of the cargo, together with the high rate of transportation, clearly implies a condition precedent to earning the increased carrying charge, dependent upon prompt delivery before navigation became impossible. It is denied that libelant used due diligence in prosecuting the voyage, and alleged that in fact the steamship and libelant, her owner, were negligent in failing to use proper steps to proceed through the lower St. Mary's river, there being clear water in the lower channels, and hence must respond in damages.

The answer to the cross-libel denies any asserted understanding between the parties as to time of delivery prior to laying up for the season, and states that failure to continue the voyage was due to an act of God, from which the steamer was absolved from liability by the Water Carriage of Goods Act of the Dominion of Canada, the country where the shipment began and where the charter party was entered into, and further that the delay was due to causes for which libelant was not responsible.

There was considerable testimony taken at the trial on both sides, and it was disclosed in argument that there were other libels pending in this court by vessel owners, who also laid up their vessels at the Soo, owing to the ice blockades, and which were sailing under similar charters and bills of lading. It is elicited that the Grammer proceeded down-bound immediately after loading at Ft. William, and, after passing through the locks at Sault Ste. Marie, the situation lower down, as to further progress, had become intensely critical, because of the severe cold weather and frozen channels. It is claimed that great efforts were being made to open the channels by men experienced in lake navigation, and in opening blockades from the accumulation of ice and snow oftentimes prevalent in the

locality on the approach of winter; that under the directions of combined owners of the detained vessels, who were anxiously desirous of relieving their ships and continuing to their respective destinations, three powerful harbor tugs and a powerful ice-wrecking vessel, The Favorite, were hired by various vessel owners, including libelant, to break through the frozen channels in the expectancy of making paths for clearance; that in both channels—one down-bound and the other up-bound, the West Neebish and Middle Neebish, respectively—the work of testing, ice-breaking, and channeling paths was in progress during a period of four days, involving the expenditure of a large amount of money by the interested vessel owners, but that on December 17th, when efforts and exertions proved unavailing, it was reluctantly concluded by the experienced men in control to abandon further attempts, owing to the fear that the tugs used in the operations, regardless of their high power, would become helplessly ice-bound and unable to return to their base. No grain-carrying vessel passed down the regular down-bound channel after December 11th. The Harmonic, however, a passenger vessel of high power, passed down the up-bound channel, but reference to her will be made at another place. In all, 29 steam vessels, including the Grammer—22 carrying grain—were laid up below the locks in consequence of the freezing of the channels and failure to open them.

■■ Was there a breach of the charters, as distinguished from the bills of lading? The contract of carriage, in my opinion, constituted the written charters, including the bills of lading, since reference was therein made to the contract. The charters were entered into, I find, on December 5 and 9, 1927, respectively, at Winnipeg, and provided for the transportation. They specified the time of lading and rate of freight without naming any time of actual carriage or delivery, while the bills of lading, eight in number, prepared by the Lake Shippers' Association, on instructions from respondent's agent, dated at Port Arthur, December 9, 1927, referred to the charters and shipment of the grain aboard the Grammer, now in Port Arthur and bound for Buffalo, delivery to Douglass, agent, rate of freight as per agreement, and shipment subject to terms of Water Carriage of Goods Act. Since neither the charters nor bills of lading specified time of delivery of the grain, I think the general rule in admiralty applies, to wit, in the performance of the contract in a reasonable manner and the prosecution of

her voyage to the port of delivery, before earning the stipulated freight, the carrier was required to use due diligence to foresee and anticipate the customary weather conditions at the Soo in early December, and make efficient effort to overcome any obstructions to her arrival within a reasonable time. Resort to extraordinary means to keep the ice and sleet from forming a barrier or blockade, as distinguished from diligent effort to progress the voyage when confronted with difficulty, was not required.

It is often difficult to determine the measure of reasonable diligence or reasonable time of delivery, since shipments by water are controlled by conditions relating to accidents of one kind or another, storms, collisions, etc., and in inland waters, especially on the Great Lakes, blockades of ice in harbors and channels forming in the month of December, which may or may not be breakable by the use of instrumentalities or the power of the vessel for continuance of the trip. Although carriers ordinarily insure the safety of the goods transported, and are liable to the shipper for damage sustained, unless delivery is prevented by vis major, or public enemy, or by an act of the shipper, they do not generally guarantee the time of the arrival of the vessel at her port of destination.

■■ The contract of carriage with which we are dealing was entered into in Canada, and, I think, is governed by the laws of Canada. Dietrich v. U. S. Shipping Board (C. C. A.) 9 F.(2d) 733, apparently supports this rule, applying to contracts silent as to time of delivery. Even though the bills of lading are not strictly to be considered in connection with the charters, since they are not inconsistent therewith, they may, I think, fairly be considered as evidence of the intendment of the parties. The lateness of the season permits the inference that the contracting parties were aware of the possible difficulties and perils which might retard and prevent prompt delivery, or even stop delivery before the ensuing spring. It was not unusual to enter into similar contracts for down-bound transportation in early December. A like situation presented itself the previous winter at the Soo, and the risks, uncertainties, and probabilities from freezing up of channels doubtless were in the minds of the parties at the time of chartering the Grammer. Accordingly, the rule of law is that, if the ice blockade in St. Mary's river, after exertion and diligence by the steamship to go forward, actually prevented delivery, then libelant, in my opinion, was excused

from earlier delivery and justified in remaining, during the winter, in a place of safety. Allen v. Mercantile M. Ins. Co., 44 N. Y. 437, 4 Am. Rep. 700; Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; Philadelphia, etc., v. Peale (D. C.) 135 F. 606. It has even been definitely held, in a few of the cited decisions, that where a vessel is detained by floating ice, and the cargo owner demands the goods at the point of detention, full freight has been earned. Parsons v. Hardy, 14 Wend. (N. Y.) 215, 28 Am. Dec. 521; Thebideau v. Cairns (D. C.) 171 F. 233; Philadelphia & R. Ry. Co. v. Peale (D. C.) 135 F. 606.

Respondent's earnest contention that a fair construction of the contract required delivery before severe winter conditions prevented, and constituted a condition precedent to payment of the agreed high rate of freight, regardless of diligent endeavor to perform, is not maintainable, for, if such had been the intention of the parties or the shipper, definite words of limitation or qualification would no doubt have been included. When informed of the determination to lay up the Grammer, respondent did not protest or ask for unloading of the cargo for transportation by railroad at the expense of libelant. In support of respondent's contention that delivery before actual close of navigation was a condition precedent, reliance is placed upon Wilcox v. 500 Tons of Coal (C. C.) 14 F. 49. In that case a sailing vessel, carrying coal from Oswego to Chicago, left Oswego on November 10, 1872, and encountered severe weather, which prompted her master to lay up for the winter at Port Huron. In the ensuing spring, on arrival at Chicago, the coal was delivered and freight paid at the spring rate. The carrier sought to recover the higher rate specified in the bill of lading, but the libel was dismissed; the court holding that the shipowner had lost his lien upon delivery of the coal to the consignee without reservation of rights to the higher rate, or any understanding that delivery was subject to an existing lien. In the course of the decision, the court remarked that the departure of the vessel from Oswego was so early in the fall that the expectation of arrival at her destination before the close of navigation was not beyond probability. Negligence on the part of the vessel was alleged in laying up at Port Huron, but the court declared there was no evidence to sustain it. The dismissal of the libel was not based upon evidence that delivery of the coal before winter was a condition precedent to earning the higher rate of freight, and therefore the decision is not controlling.

Nor do I find any authority for so holding either in Holland v. 725 Tons of Coal (D. C.) 36 F. 784, or in The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772, or in Spann v. Erie Boatmen's Transp. Co., 11 Misc. Rep. 680, 33 N. Y. S. 566. In the Holland Case the vessel laid up before the formation of ice barriers, and, if the master had not delayed, he could have made seasonable delivery, it appearing that another vessel had passed him, bound for the same port, and got through successfully. The court found that the vessel was negligent in not using diligence in going forward, and therefore was not entitled to the extra freight agreed on. In The Maggie Hammond, the master abandoned the voyage without lawful excuse and without attempting to complete the contract; while in the Spann Case it was decided that freezing of the canal is such an act of vis major as will excuse performance until the obstruction be removed, and that a carrier is exonerated from proceeding whenever conditions are presented that would be deemed unsafe by a person exercising ordinary care, prudence, and foresight; and, since the proofs showed that the boat was tied up without justifiable cause, the plaintiff could not recover prorate freight and was liable for the increased expenses incurred by the shipper in consequence of the delay and in forwarding the cargo to its destination.

In the instant case the evidence shows clearly that the post-season rate or higher rate of carriage was based upon the supposition or expectation that delivery at Buffalo was not improbable before the rigors of winter stopped navigation. Under such conditions, liability for the stipulated rate, in my judgment, is not overcome, if due diligence was exercised and exertion made to surmount the obstacles that prevented complete performance. The failure to fulfill the expectations and anticipations and intentions must, however, be satisfactorily explained. The burden rests upon libelant to do so, and to show that failure of the manifest purpose of the charter was not due to any causes attributable to libelant.

I discover no fault on the part of libelant in failing to promptly deliver the cargo. The delay of two days in the arrival of the Grammer at the port of loading was due to extreme cold and stormy weather on Lake Superior. After reaching Port Arthur, the thermometer registered subzero (30 degrees at 8 a. m. December 9th). Inclement weather continued during the three days of loading—a delay of two days—and, as stated above, the

use of tugs was necessary to make paths from one elevator to another. The charters had been executed on the day preceding the arrival of the steamer, and respondent's agent, Gauer, was then fully aware of the severe cold at the Soo, and the imminent danger of St. Mary's river freezing. It may fairly be assumed, in view of his experience in supervising navigation, that he was aware of the existence of a doubt as to getting through the ice below the locks. He disregarded the request of Fawcett, libelant's agent, to change the shipping orders to require loading at one or more elevators, instead of six, to hasten departure in the hope of reaching open water below the locks.

He testified that there was conversation between him and Fawcett, before the charters were executed, relating to the prospect of getting through that fall, and that he informed Fawcett that he was not in the market for a storage cargo—meaning that he wanted through delivery—and he further testified that Fawcett allayed his anxiety by saying that the condition of the weather in the previous season had been such that there was little · possibility of the steamer being tied up. Fawcett denied having any such conversation, but, assuming the relevancy of prior negotiations and conversations, and accepting the recollection of Gauer, and waiving the denial of libelant that Fawcett had authority to warrant the prompt arrival of the steamship, I do not draw the same inference from the conversation that.is drawn by respondent. It does not reach the dignity of a warranty to deliver before close of navigation, in view of the intervening causes preventing delivery and the unavoidable abandonment of expressed hopes and expectations. Petroleum Export Co. v. Kerr S. S. Co. (C. C. A.) 32 F.(2d) 969.

Parol testimony, it is true, is often admitted to explain or amplify the consideration recited in a written contract, but proof of prior negotiations or conversations, imposing an affirmative obligation on one of the parties, which is not suggested in the writing, is not permitted, since to do so would be a new contract. Watkins Salt Co. v. Mulkey (C. C. A.) 225 F. 739. The prior oral statements, therefore, were merged in the contract, and cannot modify or limit the terms of the affreightment contract, or open the door for inference as to imperative time of delivery, for, as already stated, had the respondent so intended, or if, in the event of failure, it contemplated a variable rate of freight, specifying terms could easily have been included. U. S. v. Conkling (C. C. A.) 135 F. 508; Ryan

v. Ohmer (C. C. A.) 244 F. 31; Petrie v. Heller (D. C.) 35 F. 310.

The omission to name a particular time of delivery justifies the inference that the contracting parties were aware of the risks and probabilities and possible failure to get through the rivers at that season of the year, and, moreover, were willing to abide by the rule of law requiring the carrier to act with promptitude or reasonable dispatch, and put forth exertion and expense to overcome obstacles and delays. It is, to my mind, clearly shown, by a fair preponderance of the evidence, that the carrier was alive to the necessity of making delivery with dispatch before the usual freezing of the channels; but where a shipment is undertaken in a locality where the channels become frozen, and ice barriers are known to often become insurmountable obstructions in the month of December, the parties are confronted with an implied understanding that strict performance as to time of delivery is subject to modification or exoneration induced by vis major. This principle is clearly set forth in Murray v. Ætna Ins. Co., Fed. Cas. No. 9,955, wherein the court said:

"When a vessel takes a cargo, * * * in the fall of the year to transport to a distant point, it is one of the incidents of the navigation that owing to variable weather or freezing up, she may not be able to reach her port of destination. The mere fact that the vessel is not able to do so does not relieve the carrier from completing his contract and thus becoming entitled to his compensation."

And in Braithwaite v. Power, 1 N. D. 455, 48 N. W. 354, it was definitely ruled that a transportation on water on the verge of winter must be understood to be subject to hazards and delays resulting from the close of navigation, where nothing is shown to. the contrary in the contract. In Allen v. Mercantile Mut. Ins. Co., 44 N. Y. 437, 4 Am. Rep. 700, it was held that, though neither closing of navigation by ice nor act of God will excuse abandonment of the voyage, it may authorize detention of the cargo until the voyage can be completed. It does not follow that the 5½-cent rate of carriage was due to warranty of delivery before the actual close of navigation, as the evidence preponderatingly indicates that its purpose was to compensate for increased insurance rate and delays in loading, for which the carrier was not responsible, and detention by ice blockades, and necessity for hiring tugs to open frozen channels. Such outlays on the Great Lakes are commonly anticipated and taken into consideration by the parties in making

the contract on the approach of the close of navigation.

Proctor for respondent argued on this point that, had the steamer been unable to depart with her cargo, or had she been able to load a part of the grain only, and then was prevented from departing by freezing of channels, it would be unreasonable to hold that she had earned the high rate of transportation. But this argument for the purpose of comparison is beside the point, for at her departure from Ft. William there was reasonable probability of passing down without much, if any, delay owing to hard freezing. It was known that the utmost efforts were being made, or would be made, to keep the channels in St. Mary's river open. It is clear that Mr. Gauer, acting for respondent, conversed with grain brokers daily regarding weather conditions and the arrival and navigation of boats. He presumably was aware of the threatened difficulties confronting down-bound vessels after passing through the locks, and had reason to believe that vessel owners would exercise a proper degree of care to lift any blockade and endeavor to effect passage through the ice formations.

I now come to the important inquiry whether libelant has satisfactorily accounted for its failure to make delivery before the close of navigation, and whether due diligence was used to go forward with the cargo. The delay in loading, due to hardship at the loading point, the blockade of ice in St. Mary's river, the tying up at the Soo, and the asserted unavailing efforts to break through have already been dwelt upon. Respondent challenges the use of proper diligence to complete the voyage within a reasonable time, contending that the actual circumstances do not sustain the burden of proof placed upon libelant, which must therefore respond in damages in the cross-libel. The correspondence, telegrams, and radio telegrams in evidence fully disclose the anxiety and dread of delay. A careful review of the evidence satisfies me that owners of the Grammer acted throughout in good faith, and that everything possible was done to perform the charter. The exertions by competent and experienced men, using their skill and knowledge gleaned from ice blockades in previous years, aided by powerful tugs and mechanisms, were constantly in active employment while the steamship was tied to her dock, but ready to proceed on an instant's notice. The exertions were only given up, due to the conscientious conclusion of the experts in charge that further efforts would prove unavailing.

It is important to understand the activities put forth to enable the detained vessels to proceed. Upon arrival of the Grammer, the last vessel to pass through the locks, the steamers Riverton and Duluth having preceded her by several days, and having successfully passed down through the downbound channel, the impediment to proceeding was at its height. A committee of vessel owners, previously organized and represented by Capts. Bailey, Cornwall, and Cunning, were trying to get the vessels through. The West Neebish and Middle Neebish channels, both artificially constructed, and located about 10 miles below the locks, were seriously obstructed by ice and ice formations. The Middle Neebish, used by up-bound vessels under the rules of navigation, from below the foot of the dike was blocked with ice and snow. The West Neebish (down-bound) on December 11th, appeared open and was used, without authority from government officials, by the steamers Queen, Canadoc, and Shaughnessy to pass up the channel, and, on reaching a point between the lower dam and lower side of the rock wall, they became ice-bound. The Canadoc refused the assistance of tugs. On the next day, Mr. De Young, of the government service, and Capt. Cornwall went down the river with tugs to enforce the release of the vessels. Around the Canadoc the ice was quite solid, but her release was effected late in the afternoon. The Queen and Shaughnessy, because of darkness, remained bound. Meanwhile the steamer Bendock had entered the cut, but all these vessels, with the aid of tugs, were finally released.

On December 14th, to carry out a decision previously reached by De Young and Capt. Cornwall, Capt. Bailey, acting for the down-bound fleet, consented that the Eads, because of her great power, narrow construction, and draft, should, under his direction, force her way through the ice in the rock cut. No tug preceded her, and the action of Capt. Bailey, in making the attempt without tugs, is said to have been a vital error, and that his failure in this relation is directly responsible for failure of the boats to get through. It is true that the evidence shows that, at a conference of the experienced men in charge of the ice-breaking undertaking, there was disagreement as to the manner of using the Eads, but finally it was agreed that she should proceed unassisted. Failure to use a tug or tugs to break the ice ahead of the Eads, in the light of the failure, doubtless was an error of judgment—something, however, that the event alone was able to determine. Such an error of judgment cannot be determined to have been either a fault or lack of diligence and prudence, since it was not unreasonable

to anticipate success from the fact that on the preceding day the steamer Canadoc and three others had been released and the ice broken. As said by the Supreme Court in The Nevada v. Quick, 106 U. S. 154, 1 S. Ct. 234, 237, 27 L. Ed. 149: "Perhaps they might have done something else, which would have been better. The event is always a great teacher. * * * But these possibilities are not the criteria by which they are to be judged. * * * Did they do all that reasonable prudence required them to do under the circumstances?"

The steamer Eads remained ice-bound during the winter, although five tugs and a wrecker craft endeavored to release her. In this manner the use of the down-bound channel by the Grammer was prevented. She was delayed three days because of the violation of a rule of navigation by the up-bound steamers above mentioned in their use of the down-bound channel, which was followed by the grounding of the steamer Eads in West Neebish. The up-bound steamers were without cargo, and were unable to clear the ice in the channel; while, in all probability, if freighters held at the Soo had been able, with the aid of tugs, to follow in the wake of the steamers Riverton and Duluth, they undoubtedly would have prevented the ice from anchoring at the bottom. The irregular use of the West Neebish channel could not have been anticipated by the Grammer or its representative committee. The available equipment on hand, including tugs and wrecker tug, was sufficient to break the ice, had it not been for the delay ensuing from the unauthorized use of the West Neebish by up-bound steamers. Nor was there delay from the inactivity of the committee of vessel owners, including libelant, in their efforts to break the ice formations to enable passage. The equipment was available, as the evidence shows, from December 11th to December 18th. I find that the services of the car ferry Ste. Marie, which had succeeded in breaking up the ice the previous year, could not be obtained.

It was also claimed by respondent that there was negligence arising from failure to fasten the Eads to the tugs during the efforts to release her—such efforts having been successfully used on the steamer Harmonic; but, as to this, the evidence is that the tugs Favorite and Iowa in tandem had a line on the Eads, but their combined exertions were unavailing. The passenger steamer Harmonic, in her use of the up-bound channel or the Middle Neebish, succeeded in getting through, owing to her construction, which was different in essential parts from the Grammer or other freighters delayed at the Soo. However, her master, in his telegram of December 15th, at 11 p. m., expressed the opinion, based on his experience and knowledge of the conditions, that a freighter could not possibly pass. The Harmonic was provided with a sharp bow, narrow beam, and 6,000 horse power—again as much as had the Grammer or other vessels in the fleet. Her adaptability, power, and speed for cracking and shattering the ice was, in my opinion, the main reason for her success; while the blunt bow and wider beam and less power of the Grammer in all probability could not have surmounted the obstacles. Experienced witnesses have testified that, instead of cutting through, the freighter would have pushed the ice ahead, rendering it impossible to pass through.

Respondent's witnesses Hall, a lighthouse keeper, and Tyner and Flynn, Coast Guardsmen, substantially testified that the ice conditions in the up-bound channel were not, on December 11th, 12th, and 13th, of such a character as to render it impossible for a freighter to break through with the assistance of tugs. On December 9th, the steamer Soodoc passed through the cut, and the ice slug, Hall testified, then extended half way up the dike. On the succeeding day, he regarded it as inadvisable for boats to go through the channel, but up-bound steamers resolved to make the effort. The weather moderated on December 13th, and the slug ice (meaning ice formation under the ice surface) then extended not more than 400 feet below the dike. Flynn testified that it drifted slowly away, leaving available open water. The Harmonic, after obtaining permission on December 13th, safely passed through, aided by tugs; and, after being held fast in the ice for a time, the tugs on the next day succeeded in releasing her.

The release of the Harmonic and her final success, however, was no assurance that the freighter Grammer would have similar success. Indeed, upon considering all the facts and circumstances, I have become satisfied that the vessel owners' committee, in ceasing its efforts to pass the steamers, upon becoming aware of the actual conditions in the up-bound channel from Capt. Johnson, of the Harmonic, was justified in omitting further efforts. The proofs fully establish the futility of the freighters, held at the Soo, attempting to proceed through the up-bound channel. The Grammer could not have overcome the ice jam at the various places in the dike or in the Middle Neebish channel. It would have been hazardous to attempt it, even if

she had the opportunity. In my opinion, diligent effort was made to deliver her cargo before the final close of navigation, and in compliance with the charter; but the freezing of the channels under consideration estopped her.

Libelant, because of the conditions, has a right of recovery of the full amount of freight specified in the charter. Having reached this conclusion, it is unnecessary to consider any asserted alternative right of recovery, based on reasonable value of services in loading the steamer, storing the cargo during the winter, and delivering the same at Buffalo on opening of navigation in the ensuing spring.

Decree may be entered for libelant for the freight earned, with interest and costs, and dismissal of the cross-libel.